# In the United States Court of Federal Claims

### No. 14-960C
### Filed: July 31, 2018

* * * * * * * * * * * * * * * * **

|  |  |  |
|---|---|---|
| **LW CONSTRUCTION OF** | * | **Motion for Leave to Amend;** |
| **CHARLESTON, LLC,** | * | **Delay; False Claims Act;** |
|  | * | **Common Law Fraud; Unjust** |
| **Plaintiff,** | * | **Enrichment; Statute of** |
|  | * | **Limitations; 28 U.S.C. § 2415;** |
| **v.** | * | **28 U.S.C. § 2501; 31 U.S.C.** |
|  | * | **§ 3731; Service Disabled** |
| **UNITED STATES,** | * | **Veteran Owned Small** |
|  | * | **Business.** |
| **Defendant.** | * |  |
|  | * |  |

* * * * * * * * * * * * * * * * **

**William A. Scott**, Pederson & Scott, P.C., Charleston, SC, for plaintiff. With him was **James L. Werner**, of counsel, Parker Poe Adams & Bernstein, LLP, Columbia, South Carolina.

**Erin K. Murdock-Park**, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant.[1] With her

---

[1] Approximately one week after the case was filed by plaintiff LW Construction of Charleston, LLC, (LW) on October 8, 2014, Jeffrey Lowry, a trial attorney in the Commercial Litigation Branch of the Civil Division of the Department of Justice entered his notice of appearance as the attorney of record on behalf of the United States in the above-captioned case. On September 22, 2017, Erin Murdock-Park, also a trial attorney in the Commercial Litigation Branch of the Civil Division of the Department of Justice, filed a notice of appearance "as attorney of record for the United States" in the above-captioned case. Following Ms. Murdock-Park's September 22, 2017 notice of appearance, Mr. Lowry and Ms. Murdock-Park interchangeably filed documents before the court in the above-captioned case on behalf of defendant. For example, according to the docket for the above-captioned case, on October 13, 2017, Ms. Murdock-Park filed, on behalf of the United States, defendant's motion for leave to amend currently at issue before the court. On December 20, 2017, also according to the docket for the above-captioned case, Mr. Lowry filed, on behalf of the United States, defendant's reply in support of its motion for leave to amend. Pursuant to Rule 83.1(c) of the Rules of the Court of Federal Claims (RCFC), "[a] party may have only one attorney of record in a case at any one time," and "[a]ny attorney assisting the attorney of record must be designated 'of counsel.'" RCFC 83.1 (2018). On April 5, 2018, Ms. Murdock-Park filed a second notice of appearance, in which she stated that she was the "attorney of record for

were **Jeffrey Lowry**, Trial Attorney, Commercial Litigation Branch, Civil Division, **Martin F. Hockey, Jr.**, Deputy Director, Commercial Litigation Branch, Civil Division, **Robert E. Kirschman, Jr.**, Director, Commercial Litigation Branch, Civil Division, and **Chad A. Readler**, Acting Assistant Attorney General, Civil Division.

**O P I N I O N**

<u>**HORN, J.**</u>

Before the court is a motion by the defendant, the United States of America, "for leave of Court to amend its previously filed answer in order to assert a new affirmative defense of common law fraud, to assert fraud counterclaims pursuant to common law and to the False Claims Act, 31 U.S.C. §§ [sic] 3729," and to add a counterclaim for unjust enrichment. Previously, in its amended answer to plaintiff's amended complaint, filed on January 12, 2016, defendant had asserted a counterclaim for liquidated damages and for reprocurement costs in the amount of $1,703,353.22, stemming from the VA's reprocurement of a construction contract for the Fort Jackson National Cemetery (the Fort Jackson contract) after the VA terminated LW from performing on the Fort Jackson contract for default. Defendant now seeks to "bring counterclaims which allege that the plaintiff, LW Construction of Charleston, LLC (LW), misrepresented its status as a service-disabled veteran-owned small business (SDVOSB) in order to receive an award for the construction project at Fort Jackson National Cemetery, an award reserved for legitimate SDVOSBs." According to defendant's October 13, 2017 proposed amended answer, defendant seeks to assert four counterclaims and an affirmative defense of common law fraud. The first counterclaim, for common law fraud, seeks damages, to be determined at trial, that were caused by plaintiff's alleged, material misrepresentation of its SDVOSB status when it submitted its proposal for and was awarded the Department of Veterans Affairs' (VA) construction contract for the Fort Jackson National Cemetery, contract no. VA101CFM-C-0042, the underlying contract at issue in the above-captioned case. The second counterclaim seeks civil penalties under the False Claims Act (FCA), "31 U.S.C. § 3729(a)(1)(2006) and, as amended, 31 U.S.C. § 3729(a)(1)(A),"[2] for each of the twenty-

_____

the United States." Ms. Murdock-Park, however, stated in her April 5, 2018 notice of appearance, unlike in her September 22, 2017 notice of appearance, that the "prior attorney of record, Jeffrey Lowry, should be terminated from the case." On April 5, 2018, the court terminated Mr. Lowry as the attorney of record for the United States.

[2] In its motion for leave to amend, defendant's second and third proposed counterclaims are brought pursuant to the FCA. In its motion for leave to amend, defendant cites to 31 U.S.C. § 3729(a)(1)(A) (2012), and its former version at 31 U.S.C. § 3729(a)(1) (2006), as the sections under the FCA applicable to its second proposed counterclaim. Defendant also cites to 31 U.S.C. § 3729(a)(1)(B) (2012), and its former version at 31 U.S.C. § 3729(a)(2) (2006), as the sections under the FCA applicable to its third proposed counterclaim. Defendant, however, should not be citing to 31 U.S.C. § 3729(a)(1) (2006) as support for its second counterclaim, nor should defendant be citing to 31 U.S.C. § 3729(a)(2) (2006) as support for its third counterclaim, because the 2006 version of the FCA is not applicable to any of defendant's proposed FCA counterclaims. Instead, the

five allegedly false claims[3] requesting payment submitted by plaintiff to the VA in connection with the Fort Jackson contract. The third counterclaim seeks civil penalties under a different provision of the FCA, "31 U.S.C. § 3729(a)(2)(2006) and, as amended, 31 U.S.C. § 3729(a)(1)(B)," for each of the twenty-five allegedly false claims submitted by plaintiff.[4] The fourth counterclaim, for unjust enrichment, seeks return of all money paid by the VA to plaintiff derived from the allegedly fraudulently obtained Fort Jackson contract. Plaintiff opposes defendant's motion for leave to amend its answer with an affirmative defense and the new counterclaims because, according to plaintiff, the motion is "(i) untimely; (ii) filed solely to gain a negotiating advantage; (iii) prejudicial to LW; and (iv) futile."

---

applicable version of the FCA to defendant's proposed FCA counterclaims is the current version of the FCA, 31 U.S.C. § 3729 (2012), which incorporates the amendments to the FCA that occurred in 2009. The FCA was amended in 2009. See Fraud Enforcement and Recovery Act of 2009, Pub. L. No. 111–21, § 4(a), 123 Stat. 1617, 1621. The amendments are treated "as if enacted on June 7, 2008, and apply to all claims under the False Claims Act (31 U.S.C. 3729 et seq.) that are pending on or after that date." Id. at § 4(f), 123 Stat. at 1625; see also AEY, Inc. v. United States, 114 Fed. Cl. 619, 633 (2014) ("The amended provision, 31 U.S.C. § 3729(a)(1)(B), took effect as if enacted on June 7, 2008 and applies to all claims under the False Claims Act that were pending on or after that date."). Thus, although defendant states in its proposed amended answer that it is seeking FCA counterclaims pursuant, in part, to the 2006 version of the FCA, because all of plaintiff's alleged false claims were submitted for payment, as according to defendant, beginning in 2009, the 2006 version of the FCA does not apply to defendant's proposed FCA counterclaims. Instead, the amendments to the FCA enacted in 2009 and the current version of the FCA codified at 31 U.S.C. § 3729, are applicable to defendant's FCA counterclaims. See AEY, Inc. v. United States, 114 Fed. Cl. at 633.

[3] According to defendant's reply brief in support of its motion for leave to amend, plaintiff "submitted invoices for payment on 22 occasions between 2009 and 2012, each of which is a separate false claim." Also, according to defendant's reply brief, plaintiff submitted three additional certified claims for payment on February 17, 2015, September 15, 2015, and September 24, 2015 in connection with the Fort Jackson contract, which "each represent separate FCA violations." Defendant alleges that plaintiff submitted a total of twenty-five false claims. The plaintiff does not dispute defendant's calculation regarding the number of claims.

[4] "The difference between § 3729(a)(1) and § 3729(a)(2) [of the FCA]," the two separate provisions of the FCA under which defendant in the above-captioned case is seeking to assert two separate FCA counterclaims, "is that the former [§ 3729(a)(1)] imposes liability for presenting a false claim, while the latter [§ 3729(a)(2)] imposes liability for using a false record or statement to get a false claim paid." Jana, Inc. v. United States, 34 Fed. Cl. 447, 449 (1995).

## BACKGROUND

**Statutory Background of the VA's SDVOSB Set-Aside Program.**

Before addressing the defendant's pending motion for leave to amend, a review of the relevant statutory background regarding the VA's SDVOSB set-aside program, and a chronology regarding plaintiff's establishment in 2008 and history to the present, as well as the procedural history of the above-captioned case is helpful.

On December 26, 2006, Congress passed the Veterans Benefits, Healthcare, and Information Act of 2006, Pub. L. No. 109-461, 120 Stat. 3403 (2006), which created a new mandate for the VA to set-aside competitive procurements for SDVOSBs when two or more such businesses were likely to compete for a particular contract award. Under this Act, the VA was required to maintain a database of eligible SDVOSB entities, which was called VetBiz Vendor Information Pages (VIP), available at www.VetBiz.gov. In 2007, the VA issued guidance requiring contractors to register in the VIP database before contract award in order to be eligible for the award of a VA SDVOSB contract. At the time, the contractor, however, did not have to register in the VIP database before submitting an offer for a SDVOSB set-aside contract. According to a June 19, 2007 Department of Veterans Affairs memorandum regarding the "Veterans First Contracting Program," attached to defendant's reply in support of its motion for leave to amend, at the time, contracting officers only were required to "ensure businesses are registered in VetBiz.gov Vendor Information Pages (VIP) database and otherwise responsible prior to making award."

On May 19, 2008, however, the VA issued an interim rule requiring that contractors not only register in the VIP database, but also submit "information establishing that the business is owned and controlled by eligible parties." VA Veteran-Owned Small Business Verification Guidelines, 73 Fed. Reg. 29,024 (May 19, 2008). The interim rule also stated that the "Department of Veterans Affairs will examine the information provided by the owners and approve or disapprove applications for 'verified' status." Id. According to a Government Accountability Office Report (GAO Report) dated March 19, 2009, which defendant attached to its reply brief in support of its motion for leave to amend, despite the VA's 2008 interim rule, the VA only would begin requiring its contracting officers to award set-aside contracts to "verified" SDVOSBs by "May 2009 at the earliest," which was when the VA anticipated finalizing its rulemaking with regard to the SDVOSB set-aside program. Until at least May 2009, as stated in the GAO Report, contractors competing for SDVOSB set-aside contracts, according to VA policy at that time, "only have to be registered in VA's database to receive set-aside or sole-source awards." In fact, the VA did not publish its final rule until February 8, 2010. See VA Veteran-Owned Small Business Verification Guidelines, 75 Fed. Reg. 6098 (Feb. 8, 2010).

The verification process for the VA's SDVOSB set-aside program changed once again when Congress passed the Veterans Small Business Verification Act of 2010, Pub. L. No. 111-275, § 104, 124 Stat. 2864, 2867 (2010 Verification Act) on October 13, 2010, which occurred, according to the government, "[a]fter the GAO began reporting on abuse

of the SDVOSB program, including from awarding contracts to large businesses that misrepresented their status at the expense of legitimate SDVOSBs." According to the 2010 Verification Act, a contractor had to submit documentation to the VA's Center for Veterans Enterprise (CVE) that demonstrated its eligibility for the SDVOSB program within 90 days of receiving notice, or else be removed from the VIP database. Once it received a "verified" status from the VA, the contractor then would be included in the government's database of eligible SDVOSB contractors.

**September 11, 2008: LW is formed.**

According to LW's operating agreement, attached as an exhibit to the government's proposed amended answer, Louis White, Sidney A. Brantley and Gary D. Brantley entered into a limited liability company agreement to form LW on September 11, 2008. Both parties state in their filings before the court that Mr. White is a "disabled veteran." According to LW's operating agreement, Louis White had a 51% company interest and had made a capital contribution of $510.00, Sidney Brantley had a 25% company interest and had made a capital contribution of $250.00, and Gary Brantley had a 24% company interest and had made a capital contribution of $240.00. Notably, the operating agreement states in the management section that "the Members shall have full, exclusive and complete discretion in the management and control of the Company and shall make all decisions affecting its business and affairs." The operating agreement further states that "**all members must consent in writing in order that any of the powers set forth below may be exercised**," and then details a laundry list of powers regarding management of the company, including but not limited to the power "[t]o execute all agreements and other documents necessary to implement the purposes of the Company, and to take such actions as may be necessary to consummate the transactions contemplated thereby," "[t]o invest funds of the Company," and "[t]o hire, supervise and terminate on behalf of the Company all independent contractors and employees . . . ." (emphasis in original).

**2009: LW self-certifies as a SDVOSB and bids on the Fort Jackson contract.**

On March 30, 2009, the VA issued solicitation number VA-101-09-RP-0100 for offers to perform the construction of Phase 1B of the Fort Jackson National Cemetery (the Fort Jackson solicitation). The solicitation stated that "[t]his procurement is a Service-Disable[d] Veteran-Owned Small Business (SDVOSB) set-aside," and that "[t]he SDVOSB must be registered in the Central Contractor Registration (CCR) database. . . prior to award and must also be registered as a SDVOSB firm at the VetBiz Vendor Information Pages [VIP]." According to the declaration of the VA contracting officer, Robert Capers, who was also the source selection authority for the award of the Fort Jackson contract, he "was required to determine whether or not LW was a qualified service-disabled veteran-owned small business (SDVOSB) and eligible for the award of the contract." According to Mr. Capers' declaration, "the VA was required to review both the information in the Central Contractor Registration system, as well as the VA's Vendor Information Pages database." According to Mr. Capers, "[u]pon reviewing both databases we determined that LW had self-certified that they met the requirements for an SDVOSB."

The government attached a declaration to its reply in support of its motion for leave to amend that was signed by Benjamin Ward, who states in his declaration that he is the Chief of Risk and Compliance at the CVE at the VA and is "required to review and analyze records maintained by CVE relating to the evaluation of contractors for eligibility in the Veterans First Contacting [sic] Program." Mr. Ward's declaration also notes that LW registered as a SDVOSB on VIP "sometime before June 5, 2009." Additionally, according to Mr. Ward's declaration, "LW did not submit any documentation to CVE to support its SDVOSB status before that date." Mr. Ward's declaration also states that LW "first submitted documentation to CVE to support its SDVOSB status was [sic] on June 5, 2009.[5] The only document submitted at that time was the VA form 0877 wherein Louis White certified that he owned 51 percent of LW and that LW was owned and controlled by a service-disabled veteran." Also according to the declaration of Mr. Ward, LW submitted an application to have CVE verify its SDVOSB status on August 25, 2009. According to a January 14, 2009 letter from the VA to LW that was attached to LW's response brief in the above-captioned case, however, the VA indicated that LW has "been verified and added to the verified Veteran business database at www.VetBiz.gov." Mr. Ward states in his declaration, however, that the January 14, 2009 date on the VA's letter must be incorrect because "CVE did not review LW's verification application until August 25, 2009." According to Mr. Ward's declaration, "CVE notified LW on January 14, 2010 that LW would be listed as verified on the Vendor Information Pages database." Mr. Ward also states in his declaration that,

> [b]ased upon CVE's records and my knowledge of CVE's past practices, CVE examined and verified LW's SDVOSB status based upon Mr. White's representation of 51 percent ownership, LW's business license, and a review of available information in the Central Contractor Registration Database, LW's SBA profile, LW's Duns and Bradstreet report, the Online Certifications and Representations Application, and the USA Spending database.

On April 29, 2009, Mr. White, on behalf of LW, submitted LW's proposal in response to the Fort Jackson solicitation along with an April 29, 2009, signed cover letter to the VA. The government states in its reply in support of its motion for leave to amend that LW did not provide its operating agreement to the government as part of its proposal to the VA.[6] In its technical proposal, LW stated that it "is a full-service General Contractor

---

[5] Based on the regulatory framework discussed above, LW must have registered as an SDVOSB before June 2, 2009, the date on which it was awarded the Fort Jackson contract.

[6] According to LW's response to the motion for leave to amend, LW did submit its operating agreement to the VA in 2011, two years after it submitted its proposal for the Fort Jackson contract. LW asserts in its sur-reply to the motion for leave to amend, however, that the copy of the operating agreement the VA received in 2011 was the "same one it had since 2008." LW does not explain whether the VA received a copy of LW's operating agreement in 2008 or in 2009 when the solicitation was issued and when the Fort Jackson contract was awarded.

specializing in federal projects as a Service-Disabled Veteran-Owned Small Business. The members of LW Construction have been in the construction industry over 75 years collectively." LW's technical proposal also provided an overview of personnel at LW who would be working on the Fort Jackson contract, which consisted of the following six individuals: Louis White, Sidney Brantley, and Gary Brantley, the three founders and managing members of LW, as well as Ronald Brantley, the project superintendent, Stephen Allen, the assistant project superintendent, and Christina McAlhaney, the estimator. LW's technical proposal also contained an "Organizational Chart for Proposed Staff" that displayed Louis White, Sidney Brantley, and Gary Brantley at the top of the chart. All three individuals were labeled "Managing Member," and designated to be at the "Home Office." Only Louis White also was labeled as "Project Manager." The technical proposal also included the resumes for the six individuals. Louis White's resume had a heading stating that he was "Managing Member/Project Manager" of LW. According to the resume, Mr. White was simultaneously working at LW as "Managing Member," as well as, at Brantley Construction Company, LLC as "Project Manager." Mr. White's resume also stated that he "will be able to commit 85% of his time to the construction phases of this project."

Sidney Brantley's resume stated that he was a "Managing Member" of LW. Sidney Brantley's resume also stated that he was presently working as a managing member of LW and president of Brantley Construction Company, LLC. His resume further stated that Sidney Brantley had previously worked at Brantley Construction Company, Inc. as its president from 1997 to September 2005. In addition, Sidney Brantley's resume stated that he had obtained a B.S. in civil engineering in 1969 from The Citadel and an M.S. in civil engineering in 1973 from Clemson University.

Gary Brantley's resume stated that he was a "Managing Member" of LW, and that he was presently working as managing member at LW and as the "Managing Partner/Project Manager" of Brantley Construction Company, LLC, and had previously worked at Brantley Construction Company, Inc. as the "Vice President/Corporate Secretary/Project Manager" from 1986 to September 2005. Gary Brantley's resume further stated that:

> He is responsible to the day to day operations of Brantley construction and LW Construction. He monitors project objectives, company policies, procedures and performance standards of all field personnel, monitor [sic] material, labor and supply procurements, as well as management and distribution of equipment.

The resume for Ronald Brantley, LW's project superintendent, stated that he was at the "Present" working for both LW and Brantley Construction Company, LLC for "Special Projects" and had previously worked at Brantley Construction Company, Inc. as the "Vice President/Project Manager" from 1977 to 2002. It also stated that "Ron Brantley will be assigned full time to the site and will perform all the Project Superintendent duties."

The resume for Christina McAlhaney, the proposed estimator, stated that she worked at "Present" for Brantley Construction Company, LLC, and had previously worked at Brantley Construction Company, Inc. from 1994 to September 2005. The resume did not state that she was employed at LW at the time LW's proposal was submitted, but it did state that she "[w]ill become employed upon receipt of contract."

According to the resume for Stephen Allen, the proposed assistant project superintendent, Mr. Allen is the only individual who was included in LW's proposal as a LW team member who had not worked previously for Brantley Construction Company, LLC or Brantley Construction Company, Inc. The resume did not state that Mr. Allen was employed by LW at the time LW's proposal was submitted to the VA for the Fort Jackson contract. The resume stated, however, that Stephen Allen "[w]ill become employed upon receipt of contract."

According to plaintiff's sur-reply in response to defendant's motion for leave to amend filed on January 26, 2018, between the time LW submitted its proposal and LW was awarded the Fort Jackson contract, "Government representatives interviewed Louis White about disclosures in the Proposal," and specifically "questioned White because his phone number was at Brantley Construction Company." Plaintiff also states in its sur-reply brief that "Mr. White informed the Government that he still worked for Brantley, and would continue to work for Brantley until LW was awarded a contract."

On June 2, 2009, LW, as a SDVOSB contractor, was awarded the Fort Jackson contract no. VA101CFM-C-0042, Project Number 930CM2002B, for the expansion improvements to the VA's cemetery at Fort Jackson, South Carolina for an amount of $10,273,000.00 with an initial completion date of December 18, 2010. The work "generally included site work, new sidewalks and roads, construction of an administrative building, a maintenance building, two committal shelters, new utility infrastructure, a flag placard facility, decorative fencing, construction of ten columbarium units, concrete crypts, installation of an irrigation system, and landscaping." According to plaintiff, and based on the bond document, "STANDARD FORM 25A," (capitalization in original), attached to LW's response to the motion for leave to amend, dated November 21, 2017, it appears that one day after contract award, on June 3, 2009, LW provided to the VA payment and performance bond information. The "Indemnity Disclosure" document, included with LW's standard form 25A, stated that the indemnitors on the "performance" bond were (1) LW Construction of Charleston, LLC, (2) Brantley Construction Company, Inc., (3) BCC Holdings, L.P., (4) Brantley Management, LLC, and (5) Brantley Construction Services, LLC D/B/A Brantley Construction Company, LLC.

## October 24, 2011: LW is decertified as a SDVOSB.

According to plaintiff's brief filed in response to defendant's motion for leave to amend, "[s]ometime in early 2011, the VA removed LW from the VetBiz website," which, according to plaintiff, prompted LW to contact the VA regarding its SDVOSB status. According to a June 21, 2011 email from Gary Brantley to VetBiz Vendor Information Pages, attached to LW's response brief, LW "began sending e-mails to vip@va.gov in

early June requesting an update" regarding LW's SDVOSB verification by the VA. (underline in original). The June 21, 2011 email from Gary Brantley to VetBiz Vendor Information Pages also stated that, "we [LW] are currently bidding SDVOSB projects" and such "work is critical to the survival of LW." Based on a June 24, 2011 email from Gary Brantley to Chuck Southern, who, according to the email, was the manager of the VA's SDVOSB verification program, Gary Brantley followed up with the VA and wrote, "LW Construction of Charleston, LLC is a SDVOSB." He also wrote that, "[w]e have been told that we are 'verified' as a SDVOSB. However, recently we are not sure as our company does not appear in the VetBiz Vender Information Pages at vip.vetbiz.gov." Following LW's emails, LW submitted information on the company and its members to the VA on July 11, 2011, including, according to plaintiff's response brief, "LW's general contractor license; resumes of Louis White, Sidney Brantley, Gary Brantley, Bert Bailey and Don Houghton; financial information including Mr. White's tax returns, LW's tax returns (form 1120S), and LW's payroll information; LW's lease agreements; LW's Operating Agreement; and Articles of Organization." Then, according to plaintiff's response brief, the VA twice more requested additional information from LW, on August 23, 2011 and August 31, 2011. According to plaintiff's response brief, LW responded to the August 23, 2011 request and provided the VA with the following information:

> Sidney A. Brantley's 1040 Tax Return 2009 & 2010; Gary D. Brantley's 1040 Tax Return 2009 & 2010; 8300 Dorchester LLC Tax Return 2009 & 2010; Brantley Management, LLC Tax Return 2008 & 2009; McQueen Street, LLC Tax Return 2009 & 2010; Shellmore Investors Tax Return 2009 & 2010; Brantley Pratt, LLC Tax Return 2009 & 2010; B&B Construction of Charleston, Inc. Tax Return 2009 & 2010; Olivewood Properties, LLC Tax Return 2009 & 2010; and 2466 Clements Ferry Rd, LLC Tax Return 2009 & 2010.

According to plaintiff's response brief, LW responded to the August 31, 2011 request and provided the VA with "Sidney A. Brantley's W-2; Gary D. Brantley's W-2; Lisa G. Brantley's W-2; Joan S. Brantley's W-2; Brantley Construction Company, Inc. Tax Return 2008 & 2009; BCC Holdings, LP Tax Return 2008 & 2009."

On October 24, 2011, CVE wrote to Mr. White, informing him that "your Disabled-Service Veteran-owned small business (SDVOSB), LW Construction of Charleston, LLC (LWCC), has been denied for inclusion in the VA VetBiz Vendor Information Pages (VIP) Verification Program." CVE explained that "[t]he decision is based upon the results of CVE review of your organizing documents, publicly available information of your business conducted by CVE representatives on September 28, 2011." CVE found that Mr. White had "valid Service-Disabled status from VA and that you [Mr. White] own at least 51% of the concern." The CVE found that "after reviewing your VIP profile and other information available," CVE was "unable to conclude that you satisfy the requirements set forth in 38 CFR Part 74[7]." The CVE stated that "[a]s part of the verification process to determine

---

[7] "38 CFR Part 74," refers to 38 C.F.R. §§ 74.1–74.29 (2018), the part of the United States Code which codifies the VA's small business regulations, including 38 C.F.R. § 74.2,

ownership and control requirements identified under 38 CFR Part 74, a review of LWCC records was conducted," and "consisted of an extensive review of financial records and interviews of company personnel." The CVE then indicated:

> According to the LWCC Operating Agreement dated 09/11/2008, it identifies you [Louis White] as having 51%; Sidney Brantley 25% and Gary Brantley 24% control of LWCC. However, Section 6.01 and 6.02 states that Members can only be removed by majority consent of Members. Also Members shall have full, exclusive, and complete discretion in the management and control of the company and shall make all decisions affecting its business and affairs. In Section 11.01 of the Operating Agreement it states only with the consent of all Members, no Member may assign, sell, transfer, liquidate, encumber, or in any way alienate, all or part of the company interest. The language in the company's documents is binding. Since it is very apparent that LWCC Operating Agreement prohibits you full control of LWCC, CVE determined [sic] has determined that LWCC does not meet the requirements of 38 CFR § 74.4(i)(1).

The CVE stated that "[g]iven the evidence listed above, CVE finds issues with regard to control and therefore, cannot reasonably conclude that you, the Service-Disabled Veteran manage the day-to-day decisions and are [not] influenced by another business relationship and do not meet the requirements of 38 CFR § 74.4," and that, therefore, "CVE cannot conclude that LWCC meets the requirements of a service disabled Veteran owned small business as identified within 38 CFR Part 74." Consequently, on October 24, 2011, CVE found that LW's "business will be ineligible to participate in Veterans Frist Contracting Program opportunities with the VA," and stated that LW's "profile will be removed from the VetBiz VIP database."

On November 21, 2011, Mr. White wrote the director of CVE, requesting "reconsideration for inclusion in the VA VetBiz Vendor Information Pages (VIP) Verification Program." Mr. White wrote that LW had modified its operating agreement "to comply with Ownership and Control requirements for Service-Disabled Veteran-Owned Small Business." Mr. White also wrote that "I am a retired service disable [sic] Air Force [sic] and have already loss [sic] three months of bidding new projects while this verification process has been going on," and that, "I now run the risk of losing LW Construction unless I can resolve this matter quickly."

On March 1, 2012, CVE rejected LW's request for reconsideration and affirmed that LW did not satisfy the requirements of a SDVOSB. CVE explained that Section 11.01 of LW's operating agreement states that "all members must be in agreement to transfer any of the membership interest in the company." The CVE then explained that the final denial is "based upon a review and evaluation of the original file as well as the letter requesting reconsideration and accompanying documents."

---

which sets out the VA's "eligibility requirements a concern must meet for VetBiz Verification Program." <u>See</u> 38 C.F.R. § 74.2 (2018).

Despite LW's decertification from SDVOSB status on October 24, 2011, LW continued to perform on the Fort Jackson contract. As explained by the government in its reply in support of its motion for leave to amend, "[a]lthough the VA contracting staff assigned to the Fort Jackson project learned that LW had subsequently lost its SDVOSB status several years after the award of the contract, they did not believe a contractor's subsequent loss of SDVOSB status had any effect on a contract awarded in 2009." Plaintiff similarly states in its response brief that, "SDVOSB status is determined as of the date of an offer to the government. Once an award is made, the contractor is entitled to continue performance and receive payment even if its status changes during contract performance." (citing 13 C.F.R. § 125.15(e)(1); 38 C.F.R § 74.11(c)).

According to plaintiff, "[b]y September 10, 2011, the VA had issued time extensions on the Fort Jackson Project for a total of 350 days, with a then current completion date of December 3, 2011." Plaintiff also states that, as of August 25, 2011, "VA had approved pay applications 1 through 15," and that "the contract was 90% complete." Despite LW's loss of SDVOSB status on October 24, 2011, LW continued to perform and the VA continued to pay LW. On February 23, 2012, according to plaintiff, the VA paid LW through Pay Application 20, which showed that work was 97% complete overall. According to the government, "[b]y February 22, 2012, the VA had stopped approving payment requests from LW . . . because of LW's failure to meet the contract's scheduling requirements."

According to the declaration of VA contracting officer, Susan Lam-Sinclair, dated December 20, 2017, submitted as an exhibit to the government's reply in support of its motion for leave to amend, "[s]ince June 2012 I [Ms. Lam-Sinclair] have served as the contracting officer responsible for the VA's contract with LW Construction of Charleston, Contract No. VA101CFM-C-0042." According to Ms. Lam-Sinclair's declaration:

> During the fall of 2012, I became increasingly involved in issues of contract performance that are the subject of my final decisions.[8] At that time, through my own experiences, I began to suspect that LW was not meeting its contractual requirement for a service-disabled veteran-owned small business to perform 15% of the contract labor and that the work was actually

---

[8] The final decisions Ms. Lam-Sinclair refers to in her December 20, 2017 declaration are the two final decisions she issued as the contracting officer on the Fort Jackson contract. In particular, Ms. Lam-Sinclair stated in her December 20, 2017 declaration that:

> In that role [as contracting officer], I was responsible for the October 16, 2013 final decision to terminate the VA's contract with LW Construction of Charleston (LW) for the construction of Phase 1B of the cemetery at the Fort Jackson National Cemetery. I was also responsible for the final decision denying the claim submitted by LW on September 15, 2015 that requested money and contract time for alleged changes and delays that LW believes excused its failure to perform.

being performed by Brantley Construction. In December of 2012, I referred the matter to the VA's Office of Inspector General (OIG). Despite my referral and requests for more information, I did not receive any response from OIG concerning the results of its investigation. Before I terminated LW's contract for default, I again contacted OIG but did not receive any information about its investigation.

Ms. Lam-Sinclair also stated in her declaration that, "[h]ad I known that LW obtained the contract through fraud, I would have terminated the contract on that basis."

On August 7, 2013, as evidenced by an email thread attached as exhibits to plaintiff's response brief to the motion for leave to amend, Jeffrey L. Wehrmann, a VA senior resident engineer at the Fort Jackson National Cemetery, forwarded to Ms. Lam-Sinclair and to four other individuals at the VA an article titled, "VA slow to clean up broken veterans preference contracting mess." According to this article, which is included in the body of the email, the "VA is now verifying the qualifications of those claiming to be operators of Service-Disabled, Veteran-Owned Small Businesses." The article discussed the VA's recent effort to verify contractors' self-representation of SDVOSB status in light of a history of fraudulent misrepresentations by contractors. The article also stated, "[r]ecent studies by the Government Accountability Office and the VA's inspector general question the agency's claims that it has rooted out hucksters who lie about their service records or control of businesses to win lucrative federal set-aside and sole-source contracts." Ms. Lam-Sinclair responded to Mr. Wehrmann's email that had forwarded the article and stated that: "This program is a mess. I turned [sic] LW and two other firms and he [sic] has not been addressed." In a separate email also dated August 7, 2013 and attached to plaintiff's response brief to the motion for leave to amend, Mr. Wehrmann wrote to Ms. Lam-Sinclair and noted:

> And as you may, or may not remember or heard, in the Fall of 2011 LWC [LW of Charleston] lost their SBA Certification and couldn't bid SDVOB [sic] contracts until they got that back in place. They were discovered to have in their charter that Louis [White], the supposed Managing Member setting at 50% or lower, not the required 51%. The SBA made them rework and resubmit their charter and reapply with him being 51% sometime in 2012 and frankly that was after the loss of many subcontractors, loss of suppliers and loss of employees too. I didn't hear that that [sic] got reinstated fully but I do know that they went back to bidding small business work so I assume it got straightened out, but not for sure. That wouldn't have played a part in this contract anyway. That's what Dana I. told me when I had discussed with him.

Ms. Lam-Sinclair responded to Mr. Wehrmann's earlier email about "LWC" that "if they [LWC] lost their SDVOSB status after award, it would not play a part as Dana[9] stated."

---

[9] According to plaintiff's response to defendant's motion for leave to amend, the "Dana" referred to in this email chain is "Dana Ivey," "another [VA] contracting officer." Plaintiff

According to the letter from the Ms. Lam-Sinclair to LW, dated October 16, 2013, and attached to plaintiff's most recent amended complaint, the VA terminated the Fort Jackson contract for default on October 16, 2013. Ms. Lam-Sinclair stated in the letter that the Fort Jackson contract was "terminated for default based on project schedule and performance deficiencies." Ms. Lam-Sinclair explained:

> LW was awarded this fixed price contract on June 2, 2009. Notice to Proceed was issued on June 26, 2009 establishing an original completion date of December 10, 2009. Subsequent contract modifications added 625 calendar days changing the contract completion date to September 4, 2012. LW is now 402 calendar days beyond this completion date. And, I have determined LW will not successfully complete the contract by the current completion date of October 30, 2013 – VA accepted and established this as the completion date based on LW's proposed schedule in its September 9, 2013 Response to VA's Show Cause Notice.

Ms. Lam-Sinclair also noted in the October 16, 2013 letter that LW had "experienced consistent performance deficiencies," in areas of work required under the Fort Jackson contract, such as landscaping, repairing and replacing lawn irrigation valves, correcting for building concrete deficiencies, and replacing defective columbarium caps. Ms. Lam-Sinclair further stated that "[b]eause LW continues to have performance deficiencies, I have no confidence in LW to successfully complete this project." Ms. Lam-Sinclair reiterated that because LW had also missed eleven of twelve "critical milestones" from LW's "September 4, 2013 schedule, I [Ms. Lam-Sinclair] have no confidence in LW to successfully complete this project." Ms. Lam-Sinclair further stated that "[t]his termination for default is VA's last resort. VA made numerous attempts to resolve contractual issues by ensuring LW was aware of contract concerns and providing LW an opportunity to address the issue(s)," which included the VA sending LW four letters of concern, two show cause notices, and a cure notice.

**February 27, 2014: Landmark Construction Company files suit against LW in the United States District Court for the District of South Carolina.**

On February 27, 2014, Landmark Construction Company, a civil construction contracting firm which had subcontracted with LW to perform work on the Fort Jackson contract, whose officers and shareholders were Frederick B. and Cynthia A. Mixson, filed suit in the United States District Court for the District of South Carolina, Columbia division, against LW and Travelers Casualty and Surety Company of America (Travelers), the surety on the Fort Jackson contract. In that suit, Case No. 3:14-cv-00542-CMC, Landmark Construction Company alleged that LW had "wrongfully failed and refused to pay Landmark the balance of the Subcontract" and "the cost of performing the extra work that is properly due and owing," by:

---

provides no additional information regarding the identity of Dana Ivey, nor does the record currently before the court.

(1) failing to properly coordinate and schedule the work on the Project; (2) grossly mismanaging the Project to Landmark's detriment; (3) intentionally, negligently and actively interfering with the orderly progress of Landmark's work; (4) restricting and preventing Landmark's access to designated work areas; (5) failing to schedule and coordinate the work on the Project in a reasonable manner and to grant reasonable time extensions and constructively changing the Subcontract; (6) wrongfully failing and refusing to pay subcontract balance and legitimate claims for extra-contractual work; (7) conducting and condoning improper and unreasonable inspections; (8) wrongfully and unreasonably rejecting work completed by Landmark in accordance with the contract documents; (9) wrongful and unreasonably [sic] interpretation of contract plans and specifications that resulted in additional costs to Landmark; (10) dictating or otherwise interfering with the means and methods of construction which were to be exclusively within the control of Landmark; and (11) breaching its implied covenants of good faith and fair dealing implied in all contracts.

Landmark Construction Company alleged that it was entitled to recover $2,000,000.00 in damages from LW. Landmark Construction Company also alleged that Travelers was liable for $2,000,000.00 of the $10,273,000.00 labor and materials payment bond that it had issued on June 3, 2009 on behalf of LW because "Landmark has fulfilled all conditions of the Bond necessary for Landmark to recover under the same. Under the terms and conditions of the Bond, L-W's failure to pay Landmark renders Travelers liable on the Bond." The Stipulation of Dismissal with Prejudice filed in Case No. 3:14-cv-00542-CMC on August 17, 2015 indicates that the case was resolved through mediation.

**May 8, 2014: Frederick and Cynthia Mixson filed a *qui tam* suit against LW in the United States District Court for the District of South Carolina.**

On May 8, 2014, Frederick B. Mixson and Cynthia A. Mixson filed a *qui tam* suit against LW, Brantley Construction Company, Inc., Brantley Construction Services, Sidney A. Brantley, Gary D. Brantley, Ron Brantley, and Louis White, in the United States District Court for the District of South Carolina, seeking "treble damages and civil penalties arising from the Defendants' false statements and false claims in violation of the Civil False Claims Act, 31 U.S.C. §§ 3729 *et seq*." (emphasis in original). As noted above, the Mixsons were the officers and shareholders of Landmark Construction Company, a subcontractor to LW performing on the Fort Jackson contract. The Mixsons, however, brought the May 2014 *qui tam* suit on behalf of themselves as "citizens of the United States," and "based on their direct, independent, and personal knowledge," not on behalf of Landmark Construction Company. The Mixsons alleged:

In 2008, the Brantley Brothers conspired with Louis White to establish a Limited Liability Company to obtain SDVOSB status and compete for SDVOSB set-aside contracts. In furtherance of this enterprise, these individuals established the defendant L W [sic]. LW held itself out at all times as a corporation which was owned, operated, managed and controlled by

White; however, at all times relevant to the allegations of this complaint, LW was, in reality, operated, managed, and controlled by and through the Brantley Brothers and/or the Brantley Entities.

The Mixsons also alleged:

[T]he Brantley Brothers and/or the Brantley Entities provided the following services to LW: a) accounting and bookkeeping; b) office space and sharing; c) common employees and labor force; d) equipment and tools; e) insurance and surety bonding; f) banking and legal services; g) license qualifications and supervision, management and day to day operation and control; and h) operating capital and financing.

The Mixsons further alleged:

[T]he funds and revenues of LW were commingled and effectively controlled by the Brantley Entities. Defendant Louis White made few, if any of the management decisions of LW. The Brantley Brothers and/or the Brantley Entities determined which construction projects to bid, preparation of the project estimates, management of the projects and coordination of subcontractors and material suppliers, scheduling, preparation of subcontracts, payment application submissions and approvals and all of the primary day to day management decisions of LW. In legal matters and disputes, the Brantley Brothers and/or the Brantley Entities represented LW exclusively in a managerial and ownership capacity and displayed full authority and discretion to make the day to day business decisions of LW. Neither the Brantley Brothers nor the Brantley Entities are eligible or qualified to perform SDVOSB set-aside contracts with the United States. All defendants in this action engaged in creating LW as a false front SDVOSB qualified contractor in order to allow the Brantley Brothers and/or the Brantley Entities to obtain federal funds and monies for which they did not properly qualify.

In addition, the Mixsons alleged that defendants "falsely and fraudulently" entered into the "SDVOSB set-aside contract . . . with the United States for the construction of the Fort Jackson National Cemetery in Columbia, South Carolina," as well as five other, unrelated, SDVOSB set-aside contracts with the United States between 2010 and 2011. According to the Mixsons, "LW and the other Defendants falsely executed more that [sic] 20 change orders for the Cemetery Project and numerous progress payment applications," and that "[e]ach of the change orders and payment applications and the contract or bid itself constitutes a false claim to the United States." The Mixsons then alleged that, "[t]he United Sates [sic] has paid LW and the other Defendants in excess of ten million dollars based upon their false claims and the Defendants are liable . . . for each false claim including each change order, progress payment and the bid for the project . . . ."

On April 22, 2014, before the Mixsons filed their *qui tam* suit in the United States District Court for the District of South Carolina on May 8, 2014, the Mixsons had submitted a "Joint Pre-Filing Disclosure Statement Of Frederick B. Mixson and Cynthia A. Mixson" to and "for the benefit of the United States Attorney in Columbia, South Carolina and [to] the Civil Fraud Division of the United States Justice Department in Washington, D.C., pursuant to the qui tam provisions of the False Claims Act." The joint pre-filing disclosure statement submitted to the United States Attorney and to the Civil Fraud Division of the Department of Justice (DOJ) alleged that LW, Brantley Construction Company, Inc., Brantley Construction Services, Sidney Brantley, Gary Brantley, Ron Brantley, and Louis White had fraudulently misrepresented LW's SDVOSB status in order to obtain the Fort Jackson SDVOSB, set-aside contract. The Mixsons also attached eleven exhibits to their joint pre-filing disclosure statement to support their allegation that LW had fraudulently misrepresented its SDVOSB status when bidding on the Fort Jackson contract, which included: "LW Construction of Charleston, LLC licensing documents obtained from Contractor's Licensing Board, S.C. Department of Labor, License & Regulation' [sic]," attached as Exhibit H to the joint pre-filing disclosure statement, "LW Construction of Charleston, LLC organizational documents obtained from South Carolina Secretary of State," attached as Exhibit I to the joint pre-filing disclosure statement, and audio recordings from a March 11, 2014 meeting and from a April 21, 2014 meeting between Gary and Sidney Brantley and the Mixsons, attached as Exhibits F and G.

On August 21, 2014, before LW filed its October 8, 2014 complaint in this court, the United States filed without explanation, a brief Notice of Election to Decline Intervention in the Mixsons' *qui tam* suit. The government alleges, however, in its reply in support of its current motion for leave to amend in the above-captioned case that, "[i]n response to the *qui tam* suit, the United States Attorney's Office for the District of South Carolina conducted an investigation concerning the relators' allegations." The government states in its reply in support of its motion for leave to amend that, "[a]mong other things, the U.S. Attorney's Office, along with the VA OIG, reviewed the SDVOSB documents maintained by CVE and interviewed the relators." The government also states in its reply that "[i]n addition, investigators from the VA OIG and the Department of Defense Office of Inspector General interviewed Mr. White." The government then states in its reply to the current motion for leave to amend that ultimately, "the US Attorney's Office . . . declined to intervene in what appeared to be a qui tam suit being brought by a disgruntled subcontractor seeking leverage to obtain a settlement in the separate district court case."

**2014: The DOJ begins a criminal investigation into LW and its relationship with the Brantleys.**

According to plaintiff, "[s]ometime in 2014, the Department of Justice started a criminal investigation into LW and its relationship with the Brantleys." Based on the record before the court, it is not exactly clear when in 2014 the DOJ began, or when the DOJ

ended, its criminal investigation into LW, and the parties provide no specific dates.[10] The record before the court, however, suggests that the DOJ's criminal investigation was underway as of October 30, 2014, when the DOJ requested the United States District Court for the District of South Carolina to issue a subpoena to Patrick Luciano, a certified public accountant, to testify before a grand jury in the United States District Court for the District of South Carolina. The subpoena was signed by Robin Blume, the Clerk of the Court of the United States District Court for the District of South Carolina on October 30, 2014. The subpoena stated that John Potterfield, Assistant United States Attorney, had requested the subpoena. The subpoena also stated that Mr. Luciano was to provide "printed and certified copies" of the following records to Special Agent Doyle Mullis, of the United States Department of Defense, Office of Inspector General, Defense Criminal Investigative Service in South Carolina:

> all records related to Gary D. Brantley . . . , Sidney A. Brantley . . . , and Louis W. White . . . , to include any of your communications with Gary D. Brantley, Sidney A. Brantley, Louis W. White, Chris Hilliard, or any other person with, or representing, LW Construction of Charleston, LLC; Brantley Construction Company, Inc[.]; Brantley Construction Services; . . . from September 2008 to present. Provide all records pertaining to the establishment and management of LW Construction of Charleston, LLC, to include records pertaining to LW Construction of Charleston, LLC obtaining Federal Government contracts from September 2008 to present. Provide all records pertaining to any services or activities conducted by Brantley Construction Company, Inc.; Brantley Construction Services, LLC; or any of their affiliates (hereinafter, the Brantley companies) from September 2008 to present regarding Federal Contracts that the owners, managers, employees, contractors, or consultants of the Brantley companies advised on, assisted with, or obtained for themselves, from September 2008 to present.

**October 8, 2014: LW files the above-captioned case.**

On October 8, 2014, LW filed the case currently before this court and asserted in its original complaint a claim of "wrongful termination of the [Fort Jackson] contract by the VA" when the VA terminated LW for default on October 16, 2013. LW also requested in its original complaint that the termination for default be converted to a termination for convenience and to recover "attorneys' fees and costs relating to this action." As discussed above, on October 16, 2014, Jeffrey Lowry, an attorney in the Commercial Litigation Branch, Civil Division, of the DOJ in Washington, D.C., entered his notice of appearance as the attorney of record for the defendant in the above-captioned case. On December 8, 2014, the government filed its original answer to the complaint, but did not

---

[10] According to the government's December 20, 2017 reply in support of its motion for leave to amend, after the investigation by the DOJ, and after no criminal charges were filed against LW, there was "no longer an active criminal investigation" by the DOJ into LW.

file a counterclaim or assert any affirmative defenses at that time. After an initial conference with the parties, the court issued a scheduling Order, establishing a close of discovery date for August 3, 2015 and a trial date for November 2, 2015.

On January 26, 2015, the parties filed a Joint Preliminary Status Report in the above-captioned case, that, among items, notified the court of pending, related cases that were proceeding "in connection with the contract at issue in this case," including "two Miller Act cases currently pending in United States District Court for the District of South Carolina," and a "Qui Tam action that is currently pending in United States District Court for the District of South Carolina." With regard to the *qui tam* action, "United States of America *ex rel.*, Frederick B. Mixson and Cynthia A. Mixson v. LW Construction of Charleston, LLC, et al., Civil Action No. 3:14-cv-01859-JFA," the parties indicated in the Joint Preliminary Status Report to this court that "[t]he Government [had] declined to intervene in that case." (emphasis in original). The parties also stated that "[t]he Relators claim that LW conspired to form the Service Disabled Veteran Owned Small Business (SDVO SB) to obtain Government projects, and that it was controlled by the minority members of the company, as opposed to being controlled by the Service Disabled Veteran majority member." The Joint Preliminary Status Report filed in the current case before this court stated that "LW also understands that there is a criminal investigation relating to LW's status as a SDVO SB, and control of the company," and that "[t]he parties are unaware of how that investigation may affect this case." In particular, the parties stated that, "[i]n the event that the discovery proceedings in this case interfere with the criminal investigation or the conclusion of the investigation is necessary to assert any fraud counter-claims, the Defendant may request that the Court stay further proceedings." The Joint Preliminary Status Report also stated that the parties were "unaware of what effect the false claim issues may have on this case."

On February 17, 2015, LW submitted a signed, certified, claim for payment to the contracting officer for the Fort Jackson contract, seeking payment for alleged contract changes, delays, and other disputed items and an extension of the contract end date through October 16, 2013, for 407 additional days. On June 16, 2015, in light of LW's recently submitted claim for payment on February 17, 2015 and after conferring with the parties, the trial originally scheduled for November 2, 2015 was postponed. The court, however, ordered that regarding the existing claims in the complaint, "document discovery shall continue, but the parties may defer the taking of any depositions."[11] On September

---

[11] "[T]here must exist a contracting officer's final decision [regarding a contractor's claim for payment] (either actual or deemed denial) before a contractor can challenge such a decision in the Court of Federal Claims." Tidewater Contractors, Inc. v. United States, 107 Fed. Cl. 779, 783 (2012); see also England v. The Swanson Grp., Inc., 353 F.3d 1375, 1379 (Fed. Cir. 2004) ("[J]urisdiction over an appeal of a contracting officer's decision is lacking unless the contractor's claim is first presented to the contracting officer and that officer renders a final decision on the claim."); James M. Ellett Constr. Co. v. United States, 93 F.3d 1537,1541-42 (Fed. Cir. 1996) ("[F]or the court to have jurisdiction under the CDA [Contract Disputes Act], there must be both a valid claim, a term the act leave undefined, and a contracting officer's final decision on that claim."). Therefore, under the

15, 2015, LW submitted a revised signed and certified claim to the VA contracting officer on the Fort Jackson contract seeking entitlement to $5,370,514.97. On September 24, 2015, LW submitted a second, signed and certified claim also to the VA contracting officer on the Fort Jackson contract seeking entitlement to $216,477.86 for additional alleged changes to the contract.

On August 17, 2015, the government filed its notice of consent to the Mixsons' voluntary dismissal of their *qui tam* action, and on that same day, the Mixsons filed their stipulation of dismissal in their *qui tam* action, which was subsequently dismissed, without prejudice.[12] In October and November of 2015, Ms. Lam-Sinclair, the contracting officer for the Fort Jackson contract at the VA issued final decisions denying LW's contract claims for payment. On November 23, 2015, LW filed a motion for leave to amend its complaint in this court, which was granted by the court. On December 15, 2015, LW filed an amended complaint, asserting the following three claims: (1) "wrongful termination" of the Fort Jackson contract, (2) "entitlement [for an equitable adjustment] under the changes clause," of the Fort Jackson contract for the "additional cost incurred as a result of the changes" made by the VA to the Fort Jackson contract, and (3) "breach of contract" by the VA of the Fort Jackson contract by:

  a. providing defective plans and specifications;
  b. failing to issue changes as required by the Changes Clause;
  c. failing to extend the performance period required by the Changes Clause;
  d. wrongfully assessing liquidated damages;
  e. failing to pay for work completed by LW;
  f. failing to pay LW as required by the Payments Clause;
  g. wrongfully terminating LW for default;
  h. failing to cooperate;
  i. breaching its obligation of good faith and fair dealings;
  j. failing to provide information necessary to complete the Project; and

---

Contract Disputes Act, 41 U.S.C. §§ 7101 et seq. (2012), this court lacked subject matter jurisdiction to decide the merits of plaintiff's February 17, 2015 claim because the VA contracting officer for the Fort Jackson contract had not yet issued a final decision on the February 17, 2015 claim when plaintiff filed its complaint in this court on October 8, 2014.

[12] The government must consent to a dismissal of an action brought pursuant to Section 3729 of the FCA, such as the Mixsons' *qui tam* suit. According to 31 U.S.C. § 3730(b)(1),

  A person may bring a civil action for a violation of section 3729 for the person and for the United States Government. The action shall be brought in the name of the Government. The action may be dismissed only if the court and the Attorney General give written consent to the dismissal and their reasons for consenting.

31 U.S.C. § 3730(b)(1) (2012).

k. failing to meet with LW in order to resolve issues so that work could be completed.

LW requested in its amended complaint a finding that:

(1) the termination for default was improper;
(2) the termination for default must be converted to a termination for convenience;
(3) LW is entitled to the changes and the extension pursuant to the Changes Clause as set forth herein;
(4) The VA breached the contract;
(5) LW is entitled to compensation in the amount of $5,586.992.83 and an extension of the contract performance period until October 16, 2013; and
(6) LW is entitled to interest on the claims, attorneys' fees and costs, and for such other and further relief as this Court deems just and proper.

On January 12, 2016, the government filed its first amended answer to LW's amended complaint and counterclaimed for liquidated damages and the cost of reprocurement. At this time, the government did not assert any affirmative defenses or fraud counterclaims, or a counterclaim of unjust enrichment.

## October 13, 2017: DOJ files the pending motion for leave to amend its answer and assert counterclaims and an affirmative defense.

The October 13, 2017 motion for leave to amend defendant's answer, the current motion before the court, seeks to assert an affirmative defense of common law fraud and the following four counterclaims: (1) common law fraud, (2) a counterclaim under the FCA for LW's alleged presentation of twenty-five false claims for payment to the VA, (3) a counterclaim under the FCA for LW's alleged use of a false record or statement when it submitted twenty-five false claims for payment to the VA, and (4) unjust enrichment.

According to the government: "In November 2015, counsel for the Government" in the above-captioned case had "conferred with the United States Attorney's Office regarding the Government's decision to decline to intervene in the *qui tam action.*" (emphasis in original). Government counsel asserts that,

[b]ased on that discussion, given the decision by the U.S. Attorney's Office not to intervene in the *qui tam* action, or file charges in the criminal case, there did not appear to be any reason for the Government's counsel in this case to raise a fraud defense or to pursue a fraud counterclaim [earlier].

(emphasis in original). In particular, the government attorney states in its reply in support of its motion for leave to amend that "we did not believe there was much evidence of fraud and initially concluded the fraud claims need not be pursued." That position on the part of the government changed during the course of continuing discovery, as described below.

As established with the parties, document discovery in the above-captioned case continued from November 2015 through November 2016. Depositions began in South Carolina during the week of November 14, 2016. According to the government in its reply in support of its motion for leave to amend,

> [a]fter attending the first deposition taken by LW, on November 15, 2016, and meeting Louis White and Gary Brantley, counsel for the Government began to suspect that it was more likely than not that the Brantleys exercised control over both the ultimate decision making of LW as well as Mr. White.

The government states, "[t]hat same day, the Government renewed its investigation into LW's SDVOSB status."

On March 16, 2017, the government issued discovery requests to LW seeking documents and information related to LW's SDVOSB status. The government requested production of "all documents presented by LW Construction or its representatives to the Department of Veterans Affairs from 2008 to the present for the purposes of establishing or verifying its status as a Service-Disabled Veteran-Owned Small Business;" "all joint venture agreements, teaming agreements, contracts, subcontracts, or other agreements entered into between LW Construction and Brantley Construction;" "all communications from or to Gary Brantley, Ron Brantley, and or Louis White concerning the formation, ownership, and management of LW Construction through October 16, 2013;" "all documents describing or establishing the management and operations of LW Construction;" and "[a]ny employment agreement or contract between LW Construction and Gary Brantley," "Ron Brantley," and "Louis White."

On March 23, 2017, government counsel received documents from the VA's Center for Verification and Evaluation (previously known as the VA's Center for Veterans Enterprise) related to CVE's denial of LW's SDVOSB status in 2011. Notably, the government attorney states in its reply in support of its motion for leave to amend that after reviewing CVE's investigation results and its decision, "it became apparent that not only did LW not qualify for SDVOSB status in 2011 – the sole issue CVE was examining – LW was not a legitimate SDVOSB when it bid on the Fort Jackson contract." The government states in its reply in support of its motion for leave to amend:

> We later obtained documents in March 2017 from CVE and VA OIG [Office of Inspector General], organizations not involved in the administration of the contract, that established that the idea for the formation of LW was proposed by the Brantleys, that Louis White did not put any significant amount of money into the company, that LW was operated out of the same building as Brantley Construction, that Brantley Construction employees identified the work LW was to bid on, and that Louis White had lied to CVE investigators when he told them in 2011 that each of the principals of the company had put $250,000 into the company.

On April 17, 2017, LW responded to the government's March 16, 2017 discovery request, but did not provide the requested documents related to LW's SDVOSB status, with the exception of its proposal for the Fort Jackson contract, and argued that such requests were "not relevant or reasonably intended to lead to the discovery of relevant information relating to any claim or defense in this case." Defendant's reply in support of its motion for leave to amend states:

> After receiving LW's [discovery] response, we began the process to obtain authority for the fraud counterclaim within the Department of Justice, which required the coordination with and approval from multiple sections of the Department. Although the issue of fraud was clear [as of April 17, 2017], the coordination with various branches within the Department of Justice's Civil Division required more time than anticipated as we internally deliberated a variety of issues related to this case.

From July 2017 through September 2017, defendant continued to depose LW's witnesses[13] and, according to defendant, during these depositions, "we continued to learn information that demonstrated fraud." Defendant states:

> We learned from the deposition of Christina McAlhaney,[14] an employee of Brantley Construction, that Brantley Construction employees were seeking business opportunities and assembling bids for LW, and that Sidney Brantley made the ultimate decision regarding whether Brantley Construction or LW would bid on the project.

Defendant also states that it learned through the depositions of Gary Brantley, Sidney Brantley, and Louis White:

> [T]hat LW was funded entirely through loans provided by Brantley-affiliated firms that were passed off as personal loans from the owners. We also learned that Brantley employees eventually took over completion of the Fort Jackson contract without any formal subcontract or notice to the VA. Finally,

---

[13] Regarding the depositions, plaintiff states in its response to the government's motion for leave to amend that plaintiff deposed eleven VA fact witnesses by February 16, 2017 and that the government deposed eight fact witness between July 19, 2017 and October 13, 2017.

[14] As described above, based on the resume for Christina McAlhaney, submitted by LW as part of its proposal regarding its "project personnel experience" for the Fort Jackson contract, in 2009, Ms. McAlhaney was an employee at Brantley Construction Company, LLC at the time of contract bidding for the Fort Jackson contract. The resume states, however, that Ms. McAlhaney "[w]ill become employed upon receipt of contract." This statement in Ms. McAlhaney's resume appears to refer to the fact that she would be employed by LW upon LW's award of the Fort Jackson contract.

> among other items referenced in our motion for leave, we learned that
> Sidney Brantley currently owns 98 percent of LW, purchased from Mr. White
> for "a couple dollars."

According to defendant's reply in support of its motion for leave to amend, on September
18, 2017,[15] government counsel received authority from within the DOJ to file fraud
counterclaims to the amended complaint filed by plaintiff, as well as to assert an
affirmative defense. Thereafter, on October 13, 2017, defendant prepared and filed
defendant's motion for leave to amend its earlier answer, based on "the increasing
evidence that LW is not now and never was owned or controlled by Louis White."

## DISCUSSION

Defendant's October 13, 2017 motion for leave to amend its answer seeks the
court's permission to add fraud counterclaims, an unjust enrichment counterclaim, and
an affirmative defense of common law fraud. Plaintiff argues in its supplemental brief that
the government's common law fraud counterclaim is a "mirror image" of its affirmative
defense of common law fraud. Defendant's proposed common law fraud counterclaim
and the affirmative defense of common law fraud are almost identically pled in
defendant's proposed amended answer, but for the fact that defendant's proposed
affirmative defense is a claim for a set-off, whereas defendant's proposed common law
fraud counterclaim seeks to obtain damages "in a substantial amount to be determined
at trial." For example, under both the common law fraud counterclaim and the affirmative
defense of common law fraud in the proposed amended answer, defendant alleges that
"LW made material misrepresentations of fact" in order to obtain "a contract with the
United States," and that "[t]he United States awarded LW a contract based on LW's
material misrepresentations and made substantial payments of money in justifiable
reliance upon LW's representations." Defendant also alleges that under both the common
law fraud counterclaim and affirmative defense of common law fraud that had LW not
made "material misrepresentations of fact, it would not have received a contract with the
United States or been entitled to any of the contractual amounts it now seeks." Defendant,
however, is not asking for a determination at this time regarding the validity of the fraud
counterclaims, unjust enrichment counterclaim, or affirmative defense. Rather, in its
motion for leave to amend, defendant merely requests a chance to be heard on the
additional counterclaims and an affirmative defense included in defendant's proposed
amended answer.

Pursuant to RCFC 15(a), once twenty-one days after service of a responsive
pleading has passed, as is the case currently before the court, "a party may amend its
pleading only with the opposing party's written consent or the court's leave." RCFC 15(a)

---

[15] Defendant indicates in its October 13, 2017 motion for leave to amend that "[o]n
September 18, 2017, we received the necessary authorizations, and subsequently
informed LW and the Court of our intent to file this motion and to assert our affirmative
defense and counterclaim." Defendant, however, states in its reply brief that it received
the necessary authorization from the DOJ on September 19, 2017.

(2018). Such leave should be freely given when "justice so requires." Id. "[T]he grant or denial of an opportunity to amend is within the discretion of the District Court." Foman v. Davis, 371 U.S. 178, 182 (1962); see also Tamerlane, Ltd. v. United States, 550 F.3d 1135, 1147 (Fed. Cir. 2008) ("'The decision to grant or deny a motion for leave to amend . . . lies within the sound discretion of the trial court.'" (quoting Insituform Techs., Inc. v. Cat Contracting, Inc., 385 F.3d 1360, 1372 (Fed. Cir. 2004))); Datascope Corp. v. SMEC, Inc., 962 F.2d 1043, 1045 (Fed. Cir. 1992) ("The grant or denial of leave to amend the complaint is within the discretion of the district court, and will be reversed only for an abuse of discretion." (internal citation omitted)); Mitsui Foods, Inc. v. United States, 867 F.2d 1401, 1403 (Fed. Cir. 1989) ("It is well established that the grant or denial of an opportunity to amend pleadings is within the discretion of the trial court."); Simons v. United States, 75 Fed. Cl. 506, 508 (2007) ("Under RCFC 15(a), a party may only amend a pleading once as a matter of course; all subsequent amendments are within the discretion of the trial court." (citing RCFC 15(a); Mitsui Foods, Inc. v. United States, 867 F.2d at 1403)).

RCFC 15 "is liberally construed, and courts generally grant leave to amend if there is no 'apparent or declared reason' not to permit amendment." Sonoran Tech. & Prof'l Servs., LLC v. United States, 133 Fed. Cl. 401, 403 (2017) (quoting A & D Auto Sales, Inc. v. United States, 748 F.3d 1142, 1158 (Fed. Cir. 2014)). As the United States Court of Appeals for the Federal Circuit has recognized, reasons to deny leave to amend include, "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc." Te-Moak Bands of W. Shoshone Indians v. United States, 948 F.2d 1258, 1260 (Fed. Cir. 1991) (quoting Foman v. Davis, 371 U.S. at 182); see also Zenith Radio Corp. v. Hazeltine Research, Inc., 401 U.S. 321, 330–31 (1971) ("[I]n deciding whether to permit such an amendment, the trial court was required to take into account any prejudice that Zenith [the nonmovant] would have suffered as a result . . . ."); Shell Oil Co. v. United States, No. 2017-1695, 2018 WL 3446960, at *11 (Fed. Cir. July 18, 2018) ("[A]mendments are not allowed where they result in undue delay or prejudice." (quoting Cencast Servs., L.P. v. United States, 729 F.3d 1352, 1363 (Fed. Cir. 2013))); (A & D Auto Sales, Inc. v. United States, 748 F.3d at 1158 ("In the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.—the leave sought should, as the rules require, be 'freely given.'" (quoting Foman v. Davis, 371 U.S. at 182); Sonoran Tech. & Prof'l Servs., LLC v. United States, 133 Fed. Cl. at 403 ("The Court should deny leave to amend if there is evidence of delay, bad faith, repeated failure to correct a complaint's deficiencies, undue prejudice to the opposing party, or if the amendment would be futile."). "The existence of any one of these criteria is sufficient to deny a motion to amend, the theory being that the amendment would not be necessary to serve the interests of justice under such circumstances." Christofferson v. United States, 77 Fed. Cl. 361, 363 (2007) (quoting Spalding & Son, Inc. v. United States, 22 Cl. Ct. 678, 680 (1991)).

Generally, "[a] party should move to amend its pleading 'as soon as the necessity for altering the pleading becomes apparent,' i.e., 'at the earliest opportunity.'" Hanover Ins. Co. v. United States, 134 Fed. Cl. 51, 60 (2017) (quoting Alta Wind I Owner–Lessor C v. United States, 125 Fed. Cl. 8, 11 (2016)). Defendant is attempting to assert an affirmative defense of common law fraud in its proposed amended answer in addition to its four proposed counterclaims. RCFC 8(c)(1) states that "[i]n responding to a pleading, a party must affirmatively state any avoidance or affirmative defense, including: . . . fraud . . . ." RCFC 8(c)(1) (2018). Failure to plead an affirmative defense may result in waiver of that defense. See Pei-Herng Hor v. Ching-Wu Chu, 699 F.3d 1331, 1337-38 (Fed. Cir. 2012) (stating that failure to plead the affirmative defense of estoppel can result in waiver pursuant to Federal Rule of Civil Procedure 8(c)(1), which is parallel to RCFC 8(c)(1), when applying the law of the United States Court of Appeals for the Fifth Circuit); see also Stockton E. Water Dist. v. United States, 70 Fed. Cl. 515, 528 (2006) ("The general rule is that affirmative defenses are waived when not pleaded in the answer."). "The determinative factor" in deciding whether a party has waived its affirmative defense is "whether there is 'unfair surprise or prejudice'" to the opposing party. Shell Oil Co. v. United States, 123 Fed. Cl. at 719 (quoting Entergy Nuclear Fitzpatrick, LLC v. United States, 93 Fed. Cl. 739, 746 (2010), aff'd, 711 F.3d 1382 (Fed. Cir. 2013)).

"[M]ere delay, without some showing of prejudice, bad faith, or futility is insufficient to deny a motion to amend a complaint." Alaska v. United States, 15 Cl. Ct. 276, 280 (1988) (finding that delay of thirteen months in seeking to amend complaint, by itself, did not constitute undue delay requiring denial of motion for leave to amend); see also Hanover Ins. Co. v. United States, 134 Fed. Cl. at 61 (finding that, absent a showing of prejudice, a delay of approximately seven months after production of documents giving rise to alleged fraud against government did not warrant denying government's motion for leave to file an amended answer asserting a Special Plea in Fraud defense and fraud counterclaims under Contract Dispute Act's anti-fraud provision and FCA); Meyer Grp., Ltd. v. United States, 115 Fed. Cl. 645, 649 (2014) (finding that defendant's delay for seeking leave to amend twelve months after filing its original answer and six months after plaintiff filed an amended complaint, was, by itself, insufficient reason to warrant denial of leave to amend); Katzin v. United States, 115 Fed. Cl. 618, 621 (2014) (finding that there was no undue delay when case was less than two years old and discovery was still underway, although fact discovery had closed within the past few days); Veridyne Corp. v. United States, 86 Fed. Cl. 668, 681 (2009) (finding that the government's approximately three-year delay in obtaining critical information for additional proposed fraud counterclaims from contracting agency did not warrant denial of government's motion for leave to amend to add fraud counterclaims when contractor's additional expenses and burden of discovery did not rise to level of prejudice required to deny amendment).

There are cases, however, in which delay alone was found to have warranted denial of a motion for leave to amend when such delay is "significant." Te-Moak Bands of W. Shoshone Indians of Nevada v. United States, 948 F.2d at 1262 ("[C]ourts have not hesitated to deny motions to amend that have been filed after significant delay."). A significant delay is one that is "measured in years." Meyer Grp., Ltd. v. United States, 115 Fed. Cl. at 649 (quoting Cooke v. United States, 79 Fed. Cl. 741, 742 (2007));

see also Cencast Servs., L.P. v. United States, 729 F.3d 1352 at 1363-64 (affirming trial court's holding that the delay was unreasonable when plaintiff failed to raise its newly pleaded theory for over fifteen years after it was aware of the theory and five years after it could have first raised the theory in response to a government counterclaim); Te-Moak Bands of W. Shoshone Indians of Nevada v. United States, 948 F.2d at 1263 (finding that the tribal bands' eight year delay in filing exceptions to the government's supplemental accounting report to amend original accounting petition constituted undue delay); Shell Oil Co. v. United States, 123 Fed. Cl. 707, 727 (2015) (finding that the government's motion for leave to amend its answer to assert an affirmative defense, one fraud counterclaim under the Special Plea in Fraud statute, 28 U.S.C. § 2514 (2012), and one counterclaim under the antifraud provision of the Contract Settlement Act of 1944, 41 U.S.C. § 119 (repealed in 2011) in its answer filed approximately seven years ago in 2008, was untimely and prejudicial to the plaintiffs when the government "was on notice" of plaintiffs' related insurance coverage litigation that gave rise to the alleged fraud since 1992, approximately twenty-three years before filing its motion for leave in 2015), aff'd, 2018 WL 3446960 (Fed. Cir. July 18, 2018); Rockwell Automation, Inc. v United States, 70 Fed. Cl. 114, 124 (2006) ("[T]he government has failed to satisfy its burden of justifying why it took eight years from March 1997 before it sought to add affirmative defenses.").

"Merely proving that other cases allowed longer delays . . . does not suffice to demonstrate entitlement to amendment. Delay must be justified." Alfa Laval Separation, Inc. v. United States, 47 Fed. Cl. 305, 314 (2000) (finding that plaintiff who prevailed in bid protest was not entitled to amend complaint to add claim for proposal preparation costs, when there was a two-year delay in seeking amendment, and plaintiff failed to justify the delay). In addition, the moving party bears the burden of justifying its delay. See Te-Moak Bands of W. Shoshone Indians of Nevada v. United States, 948 F.2d at 1263; Sonoran Tech. & Prof'l Servs., LLC v. United States, 133 Fed. Cl. at 404 ("The 'party seeking to amend its complaint after significant delays bears the burden of justifying the delay.'" (citing Cupey Bajo Nursing Home, Inc. v. United States, 36 Fed. Cl. 122, 132 (1996))).

"Undue prejudice may be found when an amended pleading would cause unfair surprise to the opposing party, unreasonably broaden the issues, or require additional discovery." Cooke v. United States, 79 Fed. Cl. at 742–43 (citing Huaschild v. United States, 53 Fed. Cl. 134 (2002)). "Mere annoyance and inconvenience . . . however, are insufficient bases to warrant a denial of a motion to amend." St. Paul Fire & Marine Ins. Co. v. United States, 31 Fed. Cl. 151, 153 (1994) ("Although, in the case at bar, further minuscule time-invoking discovery may appropriately ensue, due to defendant's introduction of two additional witnesses, the aggregate effect of this extension of discovery, particularly in the absence of a firm trial date or a trial date in the distant future, does not rise to the level of undue prejudice."); see also Alaska v. United States, 15 Cl. Ct. at 280 (finding that the government was not unduly prejudiced by plaintiff's motion for leave to amend its complaint when government failed to explain what other potential hardships it would suffer other than "potentially extensive discovery," which, in light of trial date having not been scheduled, was only a "vexing inconvenience"). Further, "[t]he cost, even to plaintiff as a small business, and burden of undertaking additional discovery do

not substantiate the level of prejudice needed to overcome the liberal standard of RCFC 15(a)(2)." Veridyne Corp. v. United States, 86 Fed. Cl. at 681. The burden to prove undue prejudice is on the non-moving party. See id. ("[T]he burden to demonstrate prejudice is plaintiff's . . . ."). Although amendments filed late in litigation are not automatically prejudicial, an amended pleading is more likely to cause prejudice "the further a case has progressed before the amendment is filed." King v. United States, 119 Fed. Cl. 51, 55 (2014) (citing Laber v. Harvey, 438 F.3d 404, 427 (4th Cir. 2006)).

"When futility is asserted as a basis for denying a proposed amendment, courts do not engage in an extensive analysis of the merits of the proposed amendments." St. Paul Fire & Marine Ins. Co. v. United States, 31 Fed. Cl. at 155. Instead, "courts simply decide whether a party's proposed amendment is facially meritless and frivolous, *i.e.,* 'Where futility is proposed as a basis for denying amending a complaint, courts will discern whether a pleading is frivolous and insufficient on its face or has been adequately addressed in the prior complaint.'" Id. (emphasis in original) (quoting Alaska v. United States, 15 Cl. Ct. at 280). "This court has found that granting leave to amend a pleading would be futile if the amended complaint would fail to state a claim upon which relief can be granted . . . or if the proposed amendment would fail for lack of jurisdiction or is facially meritless and frivolous." Chapman v. United States, 130 Fed. Cl. 216, 219 (2017) (internal quotation omitted); see also Marchena v. United States, 128 Fed. Cl. 326, 330 (2016) ("A proposed amendment is futile if it would not survive a motion to dismiss."); Meyer Grp., Ltd. v. United States, 115 Fed. Cl. at 650 ("A counterclaim must contain facts sufficient to state a claim to relief that is plausible on its face to survive a motion to dismiss under Rule 12(b)(6)." (internal quotations omitted)); Shoshone Indian Tribe of the Wind River Reservation, Wyo. v. United States, 71 Fed. Cl. 172, 176 (2006) ("A motion to amend may be deemed futile if a claim added by the amendment would not withstand a motion to dismiss."). As the United States Court of Appeals for the Federal Circuit stated:

> When a party faces the possibility of being denied leave to amend on the ground of futility, that party must demonstrate that its pleading states a claim on which relief could be granted, and it must proffer sufficient facts supporting the amended pleading that the claim could survive a dispositive pretrial motion.

Kemin Foods, L.C. v. Pigmentos Vegetales Del Centro S.A. de C.V., 464 F.3d 1339, 1354-55 (Fed. Cir. 2006); see also Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc., 200 F.3d 795, 802 (Fed. Cir. 1999) (stating that "speculation" about the ultimate disposition of a counterclaim is not an appropriate basis for denying a motion for leave to file an amended counterclaim).

For example, "[a] claim that is barred by the statute of limitations would be futile." Chapman v. United States, 130 Fed. Cl. at 219. The "statute of limitations is a jurisdictional issue in the Court of Federal Claims." TS Infosys., Inc. v. United States, 36 Fed. Cl. 570, 572 (1996); see also Martinez v. United States, 333 F.3d 1295, 1316 (Fed. Cir. 2003) ("It is well established that statutes of limitations for causes of action against the United States, being conditions on the waiver of sovereign immunity, are jurisdictional

in nature."), cert. denied, 540 U.S. 1177 (2004); L-3 Commc'n Integrated Sys., L.P. v. United States, 79 Fed. Cl. 453, 461 (2007); Tyger Constr. Co. Inc. v. United States, 28 Fed. Cl. 35, 47 (1993). "In ruling on a jurisdictional motion, the court considers whether the 'facts reveal any possible basis on which the non-movant might prevail,'" such that "the claimant is entitled to offer evidence to support the claims." TS Infosys., Inc. v. United States, 36 Fed. Cl. at 572 (quoting W.R. Cooper Gen. Contractor, Inc. v. United States, 843 F.2d 1362, 1364 (Fed. Cir. 1988)) (plaintiff's motion to dismiss government's counterclaims under the FCA, Contract Disputes Act, and Forfeiture of Fraudulent Claims Act denied when timely filed within six years of date on which government had made final payment).

Plaintiff argues that defendant's motion for leave to amend its answer should be denied because:

> The government's motion was filed more than six (6) years after the VA had determined LW was not an eligible SDVOSB; more than four (4) years after the contracting officer "reported" LW over concerns with its SDVOSB certification; more than three (3) years after the DOJ declined to intervene in the Mixson Qui Tam action; and almost exactly three (3) years since the original Complaint in this case was filed.

Plaintiff also argues that granting defendant's motion for leave to amend would be futile and result in undue prejudice and that the motion for leave to amend was filed for an improper purpose.

## I.   Plaintiff's allegations of futility regarding defendant's proposed counterclaims.

First, plaintiff argues that allowing the government's proposed common law fraud, FCA, and unjust enrichment counterclaims to proceed would be futile based on applicable statutes of limitations and an inability to survive motions to dismiss, even if the proposed counterclaims were to be allowed.

### a.   Common law fraud counterclaim

Plaintiff argues that to allow defendant's proposed amended answer to include a common law fraud counterclaim to proceed would prove futile because of a time-bar under the general six-year statute of limitations for claims brought in the Court of Federal Claims, as set forth in 28 U.S.C. § 2501 (2012). The statute at 28 U.S.C. § 2501 states that "[e]very claim of which the United States Court of Federal Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues." 28 U.S.C. § 2501. According to plaintiff, more than six years has passed since LW allegedly mispresented its SDVOSB status when bidding on the Fort Jackson contract in 2009.

The United States Court of Claims, a predecessor court to the current United States Court of Appeals for the Federal Circuit, generally held that a counterclaim brought by the government, including a common law fraud counterclaim, such as being asserted by defendant in its proposed amended answer, is not subject to the six-year statute of limitations at 28 U.S.C. § 2501 because, based on the language of the statute, the six-year time-bar applies to claims brought against the government, not counterclaims brought by United States. See Rhoades v. United States, 222 Ct. Cl. 611, 613 n.1 (1980) (rejecting plaintiff's assertion that the six-year time-bar in 28 U.S.C. § 2501 bars the government's counterclaim because 28 U.S.C. § 2501 does not apply to claims brought by the government, and instead, noting that "the section specifically governing claims brought *by* the Government is 28 U.S.C. § 2415." (emphasis in original)); Jankowitz v. United States, 209 Ct. Cl. 489, 533 F.2d 538, 548 n.11 (1976) ("Plaintiff's contention that 28 U.S.C. [§] 2501 (1970) applies to counterclaims by the United States must be rejected." (citing Dugan & McNamara, Inc. v. United States, 130 Ct. Cl. 603, 611, 124 F. Supp. 650, 652 (1954))); Erie Basin Metal Prods., Inc. v. United States, 138 Ct. Cl. 67, 74, 150 F. Supp. 561, 566 (1957) ("There is no limit of time within which the Government must bring a common law action of fraud."); Dugan & McNamara, Inc. v. United States, 130 Ct. Cl. at 611 ("Plaintiff's insistence that a counterclaim is a claim within the meaning of the term 'claim' as used in Section 2501, and thus subject to the application of the limitation of that section against the Government as well as the claimant, cannot be supported." (internal reference omitted)). The United States Court of Appeals for the Federal Circuit, in an unpublished opinion, which appears to be the only on-point decision issued by the Federal Circuit on the topic to date, also stated that:

> [S]ince the Court of Federal Claims may only hear claims against the government, § 2501 governs claims against the government. The counterclaim is a claim *by* the government and is controlled by the limitations periods set forth in § 2415 (titled, "Time for commencing actions brought by the United States"). As a result, the Government's counterclaim [seeking to recover wages that it had erroneously paid to cross-appellant, a serviceman, during his civil conferment] is not barred by § 2501.

Strand v. United States, 706 F. App'x 996, 1001 (Fed. Cir. 2017) (emphasis in original).[16] Thus, this court, in line with these previous decisions, including the recent unpublished

---

[16] Over the years, there have been a few judges of this court who have applied a six-year statute of limitations at 28 U.S.C. § 2501 to an assertion of a government counterclaim. Those cases, however, specifically have dealt with a government counterclaim arising under the Special Plea in Fraud statute at 28 U.S.C. § 2514 (2012), also known as the Forfeiture of Fraudulent Claims Act, which states that:

> A claim against the United States shall be forfeited to the United States by any person who corruptly practices or attempts to practice any fraud against the United States in the proof, statement, establishment, or allowance thereof. In such cases the United States Court of Federal Claims shall specifically find such fraud or attempt and render judgment or forfeiture.

Federal Circuit <u>Strand</u> decision, agrees that the statute of limitations set forth in 28 U.S.C. § 2501 does not bar, in and of itself, the government from proposing its common law fraud counterclaim, which, as discussed further below, is permitted by the exception in 28 U.S.C. § 2415(f) (2012).

Plaintiff, however, also argues that to allow the government to amend its answer to include a common law fraud counterclaim would be futile because it is time-barred under the general six-year statute of limitations applicable to contract claims brought by the United States in any federal court in 28 U.S.C. § 2415(a) (2012), which states:

> [E]very action for money damages brought by the United States or an officer or agency thereof which is founded upon any contract express or implied in law or fact, shall be barred unless the complaint is filed within six years after the right of action accrues or within one year after final decisions have been rendered in applicable administrative proceedings required by contract or by law, whichever is later.

28 U.S.C. § 2415(a). The government responds that 28 U.S.C. § 2415(f), however, exempts the government's common law fraud counterclaim from the general statute of limitations in § 2415(a). The statute at 28 U.S.C. § 2415(f) provides:

> The provisions of this section shall not prevent the assertion, in an action against the United States or an officer or agency thereof, of any claim of the United States or an officer or agency thereof against an opposing party, a co-party, or a third party that arises out of the transaction or occurrence that is the subject matter of the opposing party's claim. A claim of the United

---

28 U.S.C. § 2514; <u>see also</u> <u>Shell Oil Co. v. United States</u>, 123 Fed. Cl. at 727 ("[T]he six-year statute of limitations in 28 U.S.C. § 2501 applies to FFCA [Forfeiture of Fraudulent Claims Act] claims alleged under 28 U.S.C. § 2514 now bars the Government from litigating a FFCA claim in this case."); <u>TS Infosys., Inc. v. United States</u>, 36 Fed. Cl. at 574 (applying the six-year statute of limitations under 28 U.S.C. § 2501 to the government's Special Plea in Fraud counterclaim); <u>SGW, Inc. v. United States</u>, 20 Cl. Ct. 174, 181 (1990) (finding that general six-year statute of limitations under 28 U.S.C. § 2501 applied to the government's Special Plea in Fraud counterclaim). In the case currently before the court, the government, in its motion for leave to amend, is not seeking a counterclaim pursuant to the Special Plea in Fraud statute. Notably, other judges of this court have disagreed with this line of cases which suggests that a government's Special Plea in Fraud counterclaim can be subject to the six-year statute of limitations under 28 U.S.C. § 2501, and instead, have found that the six-year statute of limitations at 28 U.S.C. § 2501 is inapplicable to a government's fraud counterclaim under the Special Plea in Fraud statute. <u>See</u> <u>Am. Heritage Bancorp v. United States</u>, 56 Fed. Cl. at 606 ("[W]hen 28 U.S.C. § 2501 is read in light of 28 U.S.C. § 2415, there is no statute of limitations applicable to the government's Special Plea in Fraud counterclaim."); <u>see also</u> <u>Jana, Inc. v. United States</u>, 34 Fed. Cl. at 452 ("The special plea in fraud under 28 U.S.C. § 2514 is not subject to the statute of limitations.").

States or an officer or agency thereof that does not arise out of the transaction or occurrence that is the subject matter of the opposing party's claim may, if time-barred, be asserted only by way of offset and may be allowed in an amount not to exceed the amount of the opposing party's recovery.

28 U.S.C. § 2415(f).

This court's precedent supports the government's view. As a judge of this court explained in American Heritage Bancorp v. United States:

According to the government, the only potentially applicable statute of limitations for contract claims brought *by* the United States, is 28 U.S.C. § 2415(a); however, Section 2415(f) expressly provides that the six-year limitation on such actions does not prevent the assertion of any claim "of the United States . . . against an opposing party . . . that arises out of the transaction or occurrence that is the subject matter of the opposing party's claim." 28 U.S.C. § 2415(f).

Am. Heritage Bancorp. v. United States, 56 Fed. Cl. at 606 (emphasis in original) (holding that because the government's counterclaim related to the subject matter of plaintiff's case, the government's counterclaim was not subject to the six-year statute of limitations set forth in 28 U.S.C. § 2415(a)); see also Jana, Inc. v. United States, 34 Fed. Cl. at 451 ("Common law causes of action, such as those asserted in the third, fourth, fifth, tenth, eleventh, and twelfth counterclaims, are not governed by the six-year statute of limitations on claims by the government arising from a contract, 28 U.S.C. § 2415(a), if they arise from the same transaction or occurrence that is the subject matter of the opposing party's claim [against the United States]." (internal citation and quotations omitted; alteration in original)). A government's counterclaim that directly relates to the contract that is at issue in the operative case is a counterclaim that arises out of the "transaction or occurrence that is the subject matter of the opposing party's claim" pursuant to 28 U.S.C. § 2415(f). See 28 U.S.C. § 2415(f); see also Simmonds Precision Prod., Inc. v. United States, 212 Ct. Cl. 305, 316, 546 F.2d 886, 892 (1976) ("Since the plaintiff raised the subject matter of the contract in its claim, defendant is entitled to assert a counterclaim arising out of those same contracts."); Jana, Inc. v. United States, 34 Fed. Cl. at 451 (finding that the Navy's common law counterclaims against publisher of technical manuals that brought action to recover from United States for denied claims on contract with Navy were not subject to any statute of limitations since they arose from same contracts as plaintiff publisher's claims).

Based on the record currently before the court, the government is proposing a common law fraud counterclaim, alleging that LW fraudulently misrepresented its SDVOSB status when bidding on and performing the Fort Jackson contract. As previously noted, plaintiff alleges that the government's proposed common law fraud counterclaim is barred by the six-year statute of limitations at 28 U.S.C. § 2415(a) for contract actions filed by the United States in federal court. A common law fraud claim, however, is an

action that sounds in tort. <u>See</u> <u>Brown v. United States</u>, 105 F.3d 621, 623 (Fed. Cir.) (holding that taxpayer's claim for a "fraudulent assessment" is "grounded upon fraud," and, thus, a tort claim), <u>reh'g</u> <u>denied</u> (Fed. Cir. 1997); <u>Kant v. United States</u>, 123 Fed. Cl. 614, 616-17 (2015) (stating that claims for "fraud" sound in tort); <u>Outlaw v. United States</u>, 116 Fed. Cl. 656, 662 (2014) (finding that plaintiff's claims, "fraud and coercion are tort claims" over which the court had no jurisdiction); <u>Schweitzer v. United States</u>, 82 Fed. Cl. 592, 595 (2008) (stating that a claim of "common law fraud" sounds in tort).[17] Thus, contrary to plaintiff's assertion, the government's claim for common law fraud would not be governed by the six-year statute of limitations contained in § 2415(a) for contract actions but under the three-year time-bar in § 2415(b) for tort actions. <u>See</u> 28 U.S.C. § 2415(b) ("[E]very action for money damages brought by the United States or an officer or agency thereof which is founded upon a tort shall be barred unless the complaint is filed within three years after the right of action first accrues . . . ."); <u>see also</u> <u>United States v. Intrados/Int'l Mgmt. Grp.</u>, 265 F. Supp. 2d 1, 14 (D.D.C. 2002) (holding that the government's "common-law fraud" claim was subject to the three-year limitations period for tort actions under 28 U.S.C. § 2415(b)). The general time-bar contained in 28 U.S.C. § 2415(b), however, does not apply in the current case because of the exemption in 28 U.S.C. § 2415(f), given that the fraud alleged by defendant is related to the very contract which forms the basis of plaintiff's complaint. Because the six-year statute of limitations exception in 28 U.S.C. § 2415(f) applies to defendant's motion to amend its answer to

---

[17] It is well-established that under the Tucker Act, this court does not have general jurisdiction to hear tort claims against the United States. <u>See</u> 28 U.S.C. § 1491(a)(1) (2012) ("The United States Court of Federal Claims shall have jurisdiction . . . in cases not sounding in tort."); <u>see also</u> <u>Keene Corp. v. United States</u>, 508 U.S. 200, 214 (1993) ("[T]ort cases are outside the jurisdiction of the Court of Federal Claims today."); <u>Brown v. United States</u>, 105 F.3d at 623 ("The Court of Federal Claims is a court of limited jurisdiction. It lacks jurisdiction over tort actions against the United States."); <u>Bobka v. United States</u>, 133 Fed. Cl. 405, 412 (2017) ("[Plaintiff] also alleges that the government engaged in tortious conduct, <i>e.g.</i>, fraud, negligence, and defamation. . . . This court, however does not have jurisdiction over allegations based in tort." (internal reference omitted; emphasis in original) (citing <u>Rick's Mushroom Serv. v. United States</u>, 521 F.3d 1338, 1343 (Fed. Cir. 2008))); <u>Khalil v. United States</u>, 133 Fed. Cl. 390, 392 (2017); <u>Leffebre v. United States</u>, 129 Fed. Cl. 48, 53 (2016); <u>Kant v. United States</u>, 123 Fed. Cl. at 616.  Nonetheless, this court has jurisdiction to hear a common law fraud counterclaim when brought by the United States, as is the case currently before the court, pursuant to 28 U.S.C. § 1503, which states that "[t]he United States Court of Federal Claims shall have jurisdiction to render judgment upon any set-off or demand by the United States against any plaintiff in such court." 28 U.S.C. § 1503 (2012); <u>see also</u> <u>Barrett Refining Corp. v. United States</u>, 242 F.3d 1055, 1062-63 (Fed. Cir. 2001) (citing <u>Cont'l Mgmt., Inc. v. United States</u>, 208 Ct. Cl. 501, 506, 527 F.2d 613, 616 n.2 (1975) (noting that pursuant to 28 U.S.C. § 1503, the government could bring a counterclaim sounding in tort even though the court would not have jurisdiction over such a claim if brought by a plaintiff)); <u>Tennessee Mech. Inst., Inc. v. United States</u>, 145 Ct. Cl. 344 (1959) ("Hence, under 28 U.S.C. [§] 1503, the Court of Claims can grant a judgment to the United States on a counterclaim based upon plaintiff's tortious conduct.").

include a common law fraud counterclaim, defendant is not time-barred under 28 U.S.C. § 2415 from asserting its common law fraud counterclaim. See Am. Heritage Bancorp v. United States, 56 Fed. Cl. at 606.

Plaintiff next argues that allowing the government's amended answer, which includes defendant's proposed common law fraud counterclaim, to proceed would be futile because the government "cannot establish reasonable and justifiable reliance on a representation by LW" of its SDVOSB status "which the Government had reason to know was not accurate or true." Plaintiff appears to be arguing that because LW believes that the government cannot prove by "clear and convincing" evidence that it justifiably relied on LW's representation of its SDVOSB status, to allow the government's common law fraud counterclaim would ultimately prove futile. Although defendant ultimately will have to prove the elements of its common law fraud counterclaim by clear and convincing evidence in order to prevail on the merits, see Madison Servs., Inc. v. United States, 94 Fed. Cl. 501, 510 (2010) (stating that the "clear and convincing evidence standard" is the "traditional heightened standard for proving common law fraud"), for purposes of reviewing defendant's motion for leave to amend its answer, the salient inquiry is not whether defendant is likely to prevail on the merits, but whether the "claim added by the amendment would not withstand a motion to dismiss." Shoshone Indian Tribe of the Wind River Reservation, Wyo. v. United States, 71 Fed. Cl. at 176; Jasmine Int'l Trading & Servs., Co. W.L.L. v. United States, 120 Fed. Cl. 577, 584 (2015). At this pleading stage, "speculation about the ultimate disposition of the claim is not an appropriate basis for refusing the pleading." Vivid Tech., Inc. v. Am. Sci. & Eng'g, Inc., 200 F.3d at 802. Therefore, the court does not decide the ultimate decision on this issue, but instead focuses on the elements of common law fraud.

To assert a cognizable common law fraud claim, the government must allege the following five elements of common law fraud:

(1) a representation of a material fact, (2) the falsity of that representation, (3) the intent to deceive or, at least, a state of mind so reckless as to the consequences that it is held to the equivalent of intent (scienter), (4) a justifiable reliance upon the misrepresentation by the party deceived, which induces him to act thereon, and (5) injury to the party deceived resulting from reliance on the misrepresentation.

Jasmine Int'l Trading & Servs., Co. W.L.L. v. United States, 120 Fed. Cl. at 582–83 (quoting Unigene Lab., Inc. v. Apotex, Inc., 655 F.3d 1352, 1359 (Fed. Cir. 2011)). In the context of the information currently before the court in Case No. 14-960C, contrary to plaintiff's position, the government's proposed amended answer sufficiently alleges, although it does not yet establish, the elements of a common law fraud claim.

Defendant's proposed, amended answer states:

- "LW made material misrepresentations of fact, with knowledge of, or in reckless disregard of, their truth, in order to obtain a contract with the United States."

33

- "LW intended that the United States rely upon the accuracy of the false representations referenced above."

- "The United States awarded LW a contract based on LW's material misrepresentations and made substantial payments of money in justifiable reliance upon LW's representations."

- "Absent LW's material misrepresentations of fact, it would not have received a contract with the United States or been entitled to any of the contractual amounts it now seeks."

- "LW's actions caused the United States to be damaged in a substantial amount to be determined at trial."

Defendant also specifically alleges in is proposed amended answer that Mr. White and the Brantley Brothers had the "intent" to fraudulently mispresent LW's SDVOSB status. The proposed amended answer states:

- "On or before September 11, 2008, Sidney Brantley approached Mr. White with a proposal to set up a new company that would be a separate legal entity from Brantley Construction and for which the Brantley brothers would provide the financial backing. In exchange for his cooperation in forming this new company, the Brantley brothers would give Mr. White 51% ownership."

- "In this conversation, or related conversations, Sidney Brantley explained to Mr. White that one of the goals of the company would be to obtain government contracts set aside for veterans, and that Mr. White's status as a service-disabled veteran would be of assistance in obtaining these contracts."

- "Mr. White agreed to this proposal."

- "Sidney and Gary Brantley's intent in establishing LW was to allow LW and Brantley Construction and the Brantley Companies to participate in and profit from contracts that would be awarded by the Federal Government on a set-aside basis to SDVOSBs. As Gary Brantley testified at his deposition, they both helped Mr. White and LW with the hope that 'we could – could make some money on it . . . I mean, that's – we're in business to make money.'"

Plaintiff argues in its sur-reply to defendant's motion for leave to amend that the government's common law fraud counterclaim, if allowed, would prove futile because the "Government had the reasonable opportunity to know the truth (about LW's qualification as an SDVOSB)" because LW had provided the VA in its proposal for the Fort Jackson

contract with "direct information reflecting the relationship between Louis White and Brantley Construction[18] and the individual Brantleys, as well as information about the ownership, operations and possible control of LW." The evidence currently before the court, however, does not establish that the government knew that LW had misrepresented its SDVOSB when it bid on and was awarded the Fort Jackson contract so as to negate a finding of justifiable reliance. At the time LW's proposal was evaluated and LW was awarded the Fort Jackson contract, the government was relying on LW's self-certification of its SDVOSB status. It appears that there exists at least a question as to whether LW was a legitimate SDVOSB when it bid on and received the Fort Jackson contract pursuant to the applicable regulations at that time.[19] In 2009, when LW bid on and was awarded the Fort Jackson contract, the VA was not required to verify that a contractor was actually a bona-fide SDVOSB, and only had to verify that the contractor had registered as a SDVOSB on the VIP database and Central Contractor Registration system before the VA awarded a SDVOSB set-aside contract. The agency could rely on the good faith authenticity of the offerors' and awardee's asserted SDVOSB status as registered. According to the declaration of Mr. Ward, as previously noted, upon reviewing the VIP and the Central Contractor Registration system, the VA "determined that LW had self-certified that they met the requirements for an SDVOSB," and "[b]ased on LW's representation that it was eligible for the contract, I [Mr. Ward] awarded LW Contract No. VA101CFM-C-0042 [the Fort Jackson contract]." Because the Fort Jackson contract was a SDVOSB set-aside contract, if LW had fraudulently registered and misrepresented its SDVOSB status in order to obtain the Fort Jackson contract, or other similar SDVOSB contracts, and was awarded and accepted the contract on the basis of its SDVOSB status, that could be found to be a false representation of a material fact which could form the basis of a valid fraud counterclaim. Further, the information in LW's proposal for the Fort

---

[18] Plaintiff does not indicate if plaintiff is referring to Brantley Construction Company, Inc. or Brantley Construction Company, LLC.

[19] The 2009 applicable regulation stated:

> Service-disabled veteran-owned small business concern is a business not less than 51 percent of which is owned by one or more service-disabled veterans, or in the case of any publicly owned business, not less than 51 percent of the stock of which is owned by one or more service-disabled veterans; the management and daily business operations of which are controlled by one or more service-disabled veterans, or in the case of a veteran with a permanent and severe disability, a spouse or permanent caregiver of such veteran. In addition, some businesses may be owned and operated by an eligible surviving spouse. Reservists or members of the National Guard disabled from a disease or injury incurred or aggravated in the line of duty or while in training status also qualify.

38 U.S.C. § 74.1 (2009).

Jackson contract, does not establish that the government knew or reasonably should have known that LW had misrepresented its SDVOSB status when plaintiff self-registered as a SDVOSB, submitted its proposal, or accepted the award for the Fort Jackson contract. LW's proposal for the Fort Jackson contract stated that LW is a "full-service General Contractor specializing in federal projects as a Service-Disabled Veteran-Owned Small Business." LW's proposal also stated that Louis White, a service-disabled Air Force veteran, in addition to being a managing member of LW, along with Sidney and Gary Brantley, would be the "Project Manager" for the Fort Jackson contract and "will be able to commit 85% of his time to the construction phases of this project."

There is also no clarity in the record currently before the court that the attorneys in the United States Attorney's Office in Columbia, South Carolina, who received and reviewed the Mixsons' joint-pre filing disclosure statement and *qui tam* complaint, and the attorneys in the Civil Fraud Division of the DOJ in Washington, D.C., who received a copy of the Mixsons' joint pre-filing disclosure statement before the Mixsons' *qui tam* suit was filed, had knowledge that LW had misrepresented itself at the time the contract was awarded. The record before the court indicates that United States Attorney's Office in Columbia, South Carolina concluded that it did not have sufficient evidence to pursue fraud claims against LW, as evidenced by the Notice of Election to Decline Intervention filed by the United States Attorney's Office in Columbia, South Carolina in the Mixsons' *qui tam* suit. Moreover, no criminal charges were filed against LW after review by the DOJ. Indeed, defendant's counsel in the above-captioned case has asserted numerous times in defendant's filings in support of defendant's motion for leave to amend that, initially, the then DOJ Washington based attorney counsel of record for defendant, Jeffrey Lowry, relied on the conclusions of the United States Attorney's Office in Columbia, South Carolina that there were insufficient facts to bring fraud claims against LW. According to defendant, despite the filing of the Mixsons' subsequently dismissed *qui tam* lawsuit, only in April 2017, following LW's response to the government's document discovery requests and subsequent depositions in the current case did defendant's attorney of record reevaluate and initiate the process for getting approval from DOJ supervisors to file a motion for leave to amend the answer to include fraud counterclaims, an affirmative defense of common law fraud, and an unjust enrichment counterclaim. Based on the record before the court, the court finds that defendant has sufficiently alleged its proposed common law fraud counterclaim, which would not fail based on the futility of proceeding further. See Jasmine Int'l Trading & Servs., Co. W.L.L. v. United States, 120 Fed. Cl. at 584 (finding that the government sufficiently alleged its common law fraud counterclaim to survive a motion to dismiss); see also Shoshone Indian Tribe of the Wind River Reservation, Wyo. v. United States, 71 Fed. Cl. at 178 (rejecting the argument that proposed amended pleading was not sufficiently pled to survive motion to dismiss and, instead, granting motion for leave to amend). Therefore, allowing the amendment and proceeding on defendant's proposed common law fraud counterclaim is not futile and defendant's common law fraud counterclaim is permitted to go forward.

### b. FCA counterclaims

With regard to defendant's proposed FCA counterclaims, plaintiff argues that to pursue defendant's proposed FCA counterclaims also would be futile because "the government cannot establish that any alleged misrepresentations by LW were material as required by Universal Health Services, Inc. v. United States, 136 S. Ct. 1989, 2003-04, 195 L. Ed. 2d 348 (2016)," because "the VA consciously decided to continue paying LW, and to direct LW to continue performance, including performing new and additional work, despite [the] VA's actual knowledge that LW's SDVOSB status had been revoked" in 2011. Defendant responds that this LW argument "hinges solely on the VA's revocation of its SDVOSB status in October 2011," and that the materiality inquiry should not hinge on the VA's October 2011 revocation of LW's SDVOSB status. Defendant argues that the proper inquiry for the court should be "whether LW's assertions that it was an SDVOSB, upon which the VA relied when making the contract award, were material to the award of that contract." Defendant further argues, that contrary to plaintiff's position, the VA did not pay LW under the Fort Jackson contract with "'actual knowledge'" that LW allegedly fraudulently misrepresented its SDVOSB status when it submitted its proposal for the Fort Jackson contract (citing Universal Health Servs., Inc. v. United States, 136 S. Ct. 1989, 2003).

The FCA at 31 U.S.C. § 3729, provides:

**(a) Liability for certain acts.--**

**(1) In general.**--Subject to paragraph (2), any person who--

**(A)** knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

**(B)** knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

**(C)** conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G);

**(D)** has possession, custody, or control of property or money used, or to be used, by the Government and knowingly delivers, or causes to be delivered, less than all of that money or property;

**(E)** is authorized to make or deliver a document certifying receipt of property used, or to be used, by the Government and, intending to defraud the Government, makes or delivers the receipt without completely knowing that the information on the receipt is true;

**(F)** knowingly buys, or receives as a pledge of an obligation or debt, public property from an officer or employee of the Government, or a member of the Armed Forces, who lawfully may not sell or pledge property; or

**(G)** knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property

to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government,

is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000,[20] as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. [§] 2461 note; Public Law 104-410), plus 3 times the amount of damages which the Government sustains because of the act of that person.

. . .

**(b) Definitions.**--For purposes of this section--

---

[20] The DOJ, by regulation, "has increased the penalties for FCA violations to a minimum of $5,500.00 and a maximum of $11,000.00." Alcatec, LLC v. United States, 100 Fed. Cl. 502, 526 n.13 (2011) (citing 28 C.F.R. § 85.3(a)(9)); see also Veridyne Corp. v. United States, 105 Fed. Cl. 769, 808 n.30, modified, 107 Fed. Cl. 762 (2012), aff'd in part, rev'd in part, 758 F.3d 1371 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2014); Federal Civil Penalties Inflation Adjustment Act of 1990, Pub. L. No. 101-410, 104 Stat. 890; Civil Monetary Penalties Inflation Adjustment, 64 Fed. Reg. 47,099–01, 47,104 (Aug. 30, 1999). The regulation at 28 C.F.R. § 85.3 states:

> For all violations occurring on or before November 2, 2015, and for assessments made before August 1, 2016, for violations occurring after November 2, 2015, the civil monetary penalties provided by law within the jurisdiction of the respective components of the Department, as set forth in paragraphs (a) through (d) of this section, are adjusted as provided in this section in accordance with the inflation adjustment procedures prescribed in section 5 of the Federal Civil Monetary Penalties Inflation Adjustment Act of 1990, Pub. L. 101–410, as in effect prior to November 2, 2015. The adjusted penalties set forth in paragraphs (a), (c), and (d) of this section are effective for violations occurring on or after September 29, 1999, and on or before November 2, 2015, and for assessments made before August 1, 2016, for violations occurring after November 2, 2015. For civil penalties assessed after August 1, 2016, whose associated violations occurred after November 2, 2015, see the adjusted penalty amounts in section 85.5.

> (a) Civil Division.

. . .

> (9) 31 U.S.C. 3729(a), False Claims Act, violations: minimum from $5,000 to $5,500; maximum from $10,000 to $11,000.

28 C.F.R. § 85.3 (2018). The court has the discretion to impose penalties within the statutory range. See Morse Diesel Int'l, Inc. v. United States, 79 Fed. Cl. 116, 125 (2007), recons. denied, 81 Fed. Cl. 311 (2008).

**(1)** the terms "knowing" and "knowingly" --

**(A)** mean that a person, with respect to information--

**(i)** has actual knowledge of the information;

**(ii)** acts in deliberate ignorance of the truth or falsity of the information; or

**(iii)** acts in reckless disregard of the truth or falsity of the information; and

**(B)** require no proof of specific intent to defraud;

**(2)** the term "claim"--

**(A)** means any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that--

**(i)** is presented to an officer, employee, or agent of the United States; or

**(ii)** is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government--

**(I)** provides or has provided any portion of the money or property requested or demanded; or

**(II)** will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded . . . .

31 U.S.C. § 3729 (2012) (emphasis in original); see also U.S. ex rel. Heath v. AT & T, Inc., 791 F.3d 112, 115 (D.C. Cir. 2015) ("The False Claims Act, 31 U.S.C. §§ 3729 et seq., broadly proscribes the knowing or reckless submission of false claims for payment to the federal government or within a federally funded program.").

Defendant is seeking to assert counterclaims in the above-captioned case pursuant to 31 U.S.C. §§ 3729(a)(1)(A), (B) of the FCA, which, as noted above, makes a person liable who

**(A)** knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

**(B)** knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim.

31 U.S.C. §§ 3729(a)(1)(A), (B). There is no explicit requirement in the statute that the false or fraudulent claim for payment submitted pursuant to either subsection (a) or (b) listed above contain a "material misrepresentation." See id. Nonetheless, the United States Supreme Court explained in Universal Health Services, Inc. v. United States, 136 S. Ct. 1989 (2016) that the materiality of a party's misrepresentation could play a role in determining whether a claim is false or fraudulent under the "implied false certification theory" of liability of the FCA. As the Supreme Court explained,

> [a]ccording to this theory, when a defendant submits a claim, it impliedly certifies compliance with all conditions of payment. But if that claim fails to disclose the defendant's violation of a material statutory, regulatory, or contractual requirement, so the theory goes, the defendant has made a misrepresentation that renders the claim "false or fraudulent" under § 3729(a)(1)(A).

Universal Health Servs., Inc. v. United States, 136 S. Ct. at 1995. In Universal Health Services, Carmen Correa and Julio Escobar, parents of Yarushka Rivera, who died after receiving mental health treatment by individuals at a counseling center called Arbour Counseling Services, owned and operated by Universal Health Services, brought a qui tam action against Universal Health Services. See id. at 1997. After Ms. Rivera's passing, Ms. Correa and Mr. Escobar found out few Arbour employees "were actually licensed to provide mental health counseling and that supervision of them was minimal," and that of Yarushka's treating physicians, "only one was properly licensed." Id.

Ms. Rivera's parents alleged in their qui tam complaint filed in the United States District Court for the District of Massachusetts that,

> Universal Health had violated the False Claims Act under an implied false certification theory of liability. The operative complaint asserts that Universal Health (acting through Arbour) submitted reimbursement claims that made representations about the specific services provided by specific types of professionals, but that failed to disclose serious violations of regulations pertaining to staff qualifications and licensing requirements for these services. Specifically, the Massachusetts Medicaid program requires satellite facilities to have specific types of clinicians on staff, delineates licensing requirements for particular positions (like psychiatrists, social workers, and nurses), and details supervision requirements for other staff. See 130 Code Mass. Regs. §§ 429.422–424, 429.439 (2014). Universal Health allegedly flouted these regulations because Arbour employed unqualified, unlicensed, and unsupervised staff. The Massachusetts Medicaid program, unaware of these deficiencies, paid the claims. Universal Health thus allegedly defrauded the program, which would not have reimbursed the claims had it known that it was billed for mental health services that were performed by unlicensed and unsupervised staff.

Universal Health Servs., Inc. v. United States, 136 S. Ct. at 1997–98 (footnote omitted). The United States District Court for the District of Massachusetts, although embracing the false certification theory, dismissed the Escobars' qui tam complaint because "none of the regulations that Arbour violated was a condition of payment." Id. at 1998. The United States Court of Appeals for the First Circuit reversed in part and remanded. See id. The Supreme Court, "granted certiorari to resolve the disagreement among the Courts of Appeals over the validity and scope of the implied false certification theory of liability." Id. The Supreme Court explained that the United States Court of Appeals for the Seventh Circuit had rejected the implied false certification theory, "reasoning that only express (or affirmative) falsehoods can render a claim 'false or fraudulent'" under the FCA while "[o]ther courts have accepted the theory, but limit its application to cases where

defendants fail to disclose violations of expressly designated conditions of payment," while others "hold that conditions of payment need not be expressly designated as such to be a basis for False Claims Act liability." Id. at 1998-99. The Supreme Court stated:

> We first hold that the implied false certification theory can, at least in some circumstances, provide a basis for liability. By punishing defendants who submit "false or fraudulent claims," the False Claims Act encompasses claims that make fraudulent misrepresentations, which include certain misleading omissions. When, as here, a defendant makes representations in submitting a claim but omits its violations of statutory, regulatory, or contractual requirements, those omissions can be a basis for liability if they render the defendant's representations misleading with respect to the goods or services provided.

Id. at 1999. The Supreme Court explained that "misleading omissions" that Universal Health Services made were "misleading half-truths" that "can be actionable misrepresentations." Id. at 2000. In particular, Universal Health Services' claims for Medicaid reimbursement were "more than merely demand for payment." Id. Instead,

> by submitting claims for payment using payment codes that corresponded to specific counseling services, Universal Health represented that it had provided individual therapy, family therapy, preventive medication counseling, and other types of treatment. Moreover, Arbour staff members allegedly made further representations in submitting Medicaid reimbursement claims by using National Provider Identification numbers corresponding to specific job titles. And these representations were clearly misleading in context.

Id. The Supreme Court then held that, contrary to Universal Health Services' position, the implied false certification theory should not be narrowly applied so that a party faces liability "only if it fails to disclose the violation of a contractual, statutory, or regulatory provision that the Government expressly designated a condition of payment." Id. at 2001. The Supreme Court explained that a "statement that misleadingly omits critical facts is a misrepresentation irrespective of whether the other party has expressly signaled the importance of the qualifying information." Id. The Supreme Court also noted that not every "undisclosed violation" is an actionable FCA claim but must "be material to the Government's payment decision in order to be actionable under the False Claims Act." Id. at 2002. The Supreme Court explained that "materiality standard is demanding" and that "materiality 'look[s] to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation.' 26 R. Lord, Williston on Contracts § 69:12, p. 549 (4th ed. 2003) (Williston)." Id. (alteration in original). The Supreme Court also stated:

> A misrepresentation cannot be deemed material merely because the Government designates compliance with a particular statutory, regulatory, or contractual requirement as a condition of payment. Nor is it sufficient for a finding of materiality that the Government would have the option to decline to pay if it knew of the defendant's noncompliance. Materiality, in addition,

cannot be found where noncompliance is minor or insubstantial. See United States ex rel. Marcus v. Hess, 317 U.S. 537, 543, 63 S. Ct. 379, 87 L. Ed. 443 (1943) (contractors' misrepresentation that they satisfied a non-collusive bidding requirement for federal program contracts violated the False Claims Act because "[t]he government's money would never have been placed in the joint fund for payment to respondents had its agents known the bids were collusive"); see also Junius Constr., 257 N.Y., at 400, 178 N.E., at 674 (an undisclosed fact was material because "[n]o one can say with reason that the plaintiff would have signed this contract if informed of the likelihood" of the undisclosed fact).

In sum, when evaluating materiality under the False Claims Act, the Government's decision to expressly identify a provision as a condition of payment is relevant, but not automatically dispositive. Likewise, proof of materiality can include, but is not necessarily limited to, evidence that the defendant knows that the Government consistently refuses to pay claims in the mine run of cases based on noncompliance with the particular statutory, regulatory, or contractual requirement. Conversely, if the Government pays a particular claim in full despite its actual knowledge that certain requirements were violated, that is very strong evidence that those requirements are not material. Or, if the Government regularly pays a particular type of claim in full despite actual knowledge that certain requirements were violated, and has signaled no change in position, that is strong evidence that the requirements are not material.

Universal Health Servs., Inc. v. United States, 136 S. Ct. at 2003–04.

In the instant case, the defendant's proposed FCA counterclaims should not, at this stage of the proceedings, be considered futile for a lack of a material misrepresentation. The relevant inquiry is not whether the government will absolutely prevail on the merits of its FCA counterclaims, but whether "if a claim added by the amendment would not withstand a motion to dismiss." Shoshone Indian Tribe of the Wind River Reservation, Wyo. v. United States, 71 Fed. Cl. at 176. Based on the record currently before the court, the VA had restricted competition for the Fort Jackson contract only to eligible SDVOSBs. The solicitation for the Fort Jackson contract stated that the "procurement is a Service-Disable Veteran-Owned Small Business (SDVOSB) set-aside," and that "[o]ffers received from concerns that are not service-disabled veteran-owned small business concerns shall not be considered." (emphasis added). The Fort Jackson solicitation makes clear that, but for LW's representation that it was a SDVOSB, the VA would not have considered LW's proposal for the award of the Fort Jackson contract.[21]

---

[21] As noted above, the Supreme Court in Universal Health Services, Inc. indicated that "if the Government pays a particular claim in full despite its actual knowledge that certain requirements were violated, that is very strong evidence that those requirements are not material." Universal Health Servs., Inc. v. United States, 136 S. Ct. at 2003-04. The court

Although plaintiff alleges that "any representations by LW about its SDVOSB status after October 2011 cannot be considered fraudulent" because the VA had decertified LW's SDVOSB status in 2011, there is no indication before the court that the VA's decertification of LW's status in 2011 is dispositive in this case as to the materiality of LW's alleged misrepresentation of its SDVOSB status when it bid on and was awarded the Fort Jackson contract in 2009. As defendant states, "the sole issue CVE was examining" in 2011 when LW was decertified was whether LW qualified as a SDVOSB in 2011, not whether LW had mispresented its SDVOSB status in 2009, when LW submitted its proposal and was awarded the Fort Jackson contract. According to applicable regulations at the time, a contractor's status as a SDVOSB is relevant to the contracting agency's handling of the procurement process when the contractor submits its proposal for a SDVOSB set-aside contract and is awarded a contract. Subsequent changes to a contractor's SDVOSB status would not necessarily impact the contractor's ability to continue to perform on a previously awarded contract. According to the regulations regarding contracting with the federal government by a SDVOSB, as promulgated by the Small Business Administration (SBA), a "concern," i.e., a contractor,

> that represents itself and qualifies as an SDVO [service disabled veteran owned] SBC [small business concern] at the time of initial offer (or other formal response to a solicitation), which includes price, including a Multiple Award Contract, is considered an SDVO SBC throughout the life of that contract. This means that if an SDVO SBC is qualified at the time of initial offer for a Multiple Award Contract, then it will be considered an SDVO SBC for each order issued against the contract, unless a contracting officer requests a new SDVO SBC certification in connection with a specific order. Where a concern later fails to qualify as an SDVO SBC, the procuring agency may exercise options and still count the award as an award to an SDVO SBC.

13 C.F.R. § 125.18(e)(1) (2018); see also NEIE, Inc. v. United States, No. 13-164C, 2013 WL 6406992, at *20 (Fed. Cl. Nov. 26, 2013) (unpublished opinion) ("[T]he FAR only requires that a contractor meet the eligibility requirements for an SDVOSB *at the time of offer.*" (emphasis in original)). Even plaintiff acknowledges in its response brief to defendant's motion for leave to amend its answer that a subsequent change in a contractor's SDVOSB status while performing on a contract does not necessarily require the VA to terminate the contract. Plaintiff states in its response brief that, "[o]nce an award is made, the contractor is entitled to continue performance and receive payment even if its status changes during contract performance." Whether the government knew or should have known that LW had misrepresented its SDVOSB status when it bid on the Fort Jackson contract is the operative issue, not whether LW was allowed to continue to perform on the Fort Jackson contract once LW's SDVOSB status was revoked in 2011.

_____

notes, however, there is no evidence in the record that the VA had actual knowledge that LW was not a SDVOSB when it submitted its proposal for the Fort Jackson contract or when it received the contract award.

The court, therefore, finds that defendant has met materiality concerns with respect to all of defendant's proposed FCA counterclaims. See Shoshone Indian Tribe of the Wind River Reservation, Wyo. v. United States, 71 Fed. Cl. at 178.

Plaintiff also argues that the government's proposed FCA counterclaims cannot be pursued by defendant because they are time-barred under the statute of limitations set forth in the FCA. Defendant responds in its reply in support of its motion for leave to amend that "each claim for payment by LW to the Government is its own FCA claim with a separate statute of limitations inquiry." Defendant then states that:

> LW cannot establish that *all* of the Government's FCA claims are time-barred. LW submitted invoices for payment on 22 occasions between 2009 and 2012, each of which is a separate false claim. The statute of limitations period for each of these invoices is six years after the date of the fraudulent submissions, thus, at the very least, all 4 invoices for payment made to LW on or after October 13, 2011 are within the statute of limitations. 31 U.S.C. § 3731(b)(1). Moreover, the three additional claims LW filed in this case— on February 17, 2015, September 15, 2015, and September 24, 2015— each represent separate FCA violations. These FCA violations are clearly not time-barred even under LW's flawed interpretation of section 3731(b).

(emphasis in original). The government also responds in its supplemental brief that "even if recovery for some of LW Constructions [sic] false claims would be time-barred under section 3731 in an affirmative claim, the Government still has the right to raise those time-barred claims in response to LW's complaint pursuant to 28 U.S.C. § 2415(f)." Plaintiff responds in its supplemental brief that the exception contained in 28 U.S.C. § 2415(f) does not supersede other statute of limitations, such as statute of limitations set forth in the FCA. Thus, according to plaintiff, 28 U.S.C. § 2415(f) does not have "any application to or impact" on the FCA statute of limitations.

As an initial matter, the government correctly asserts in its reply brief that each claim for payment by LW to the government can be its own FCA claim resulting in a separate statute of limitations inquiry. "[C]laims submitted pursuant to a fraudulently obtained contract are FCA violations even if the claims themselves do not contain false statements." Veridyne Corp. v. United States, 758 F.3d 1371, 1379 (Fed. Cir.) (citing United States ex rel. Marcus v. Hess, 317 U.S. 537, 543-44 (1943)), reh'g and reh'g en banc denied (Fed. Cir. 2014). Based on the government's reply brief, "LW submitted invoices for payment on 22 occasions between 2009 and 2012." Additionally, based on the evidence currently before the court, LW filed three certified claims for payment to the VA contracting officer for the Fort Jackson contract since it filed the above-captioned case on October 8, 2014. The twenty-two invoices and three certified claims for payment are each a "claim" for purposes of the FCA. See 31 U.S.C. § 3729(b)(2)(A) ("the term 'claim' . . . means any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property . . . ."); see also Veridyne Corp. v. United States, 758 F.3d at 1380 (stating that each of Veridyne's 127 invoices for payment submitted to the agency on a government contract

was considered a separate "claim" for purposes of the FCA, and affirming the award of $11,000.00 for each of the 127 claims). Thus, defendant alleges that LW, potentially could be liable for a total of twenty-five false claims.

Defendant asserts that, pursuant to 28 U.S.C. § 2415(f), the government may bring counterclaims that are otherwise time-barred by the more general terms of the FCA statute of limitations. 28 U.S.C. § 2415 is the statute of limitations regarding certain causes of action brought by the United States in federal court titled: "Time for commencing actions brought by the United States." See 28 U.S.C. § 2415 (2012). Pursuant to subsection (a), the United States has six years to file an "action for money damages" which is "founded upon any contract express or implied in law or fact." 28 U.S.C. § 2415(a). Pursuant to subsection (b), the United States has three years to file an "action for money damages" which is founded "upon a tort." 28 U.S.C. § 2415(b). Pursuant to subsection (d), the United States has six years to file an

> action for the recovery of money erroneously paid to or on behalf of any civilian employee of any agency of the United States or to or on behalf of any member or dependent of any member of the uniformed services of the United States, incident to the employment or services of such employee or member.

28 U.S.C. § 2415(d). Subsection (f) of 28 U.S.C. § 2415 states that, regardless of the time-bars contained in Section 2415, the United States can still assert any other claims that arises from the subject matter at issue in the original case as a counterclaim. See 28 U.S.C. § 2415(f). As previously noted, subsection (f) states:

> The provisions of this section shall not prevent the assertion, in an action against the United States or an officer or agency thereof, of any claim of the United States or an officer or agency thereof against an opposing party, a co-party, or a third party that arises out of the transaction or occurrence that is the subject matter of the opposing party's claim. A claim of the United States or an officer or agency thereof that does not arise out of the transaction or occurrence that is the subject matter of the opposing party's claim may, if time-barred, be asserted only by way of offset and may be allowed in an amount not to exceed the amount of the opposing party's recovery.

Id.[22]

---

[22] The court notes in that Jana, Inc. v. United States, a judge of this court did dismiss the government's FCA counterclaims she found time-barred under the FCA without even raising the possibility that 28 U.S.C. § 2415(f) could potentially allow the government to bring an otherwise time-barred FCA counterclaim, as defendant alleges in the current case before the court. See Jana, Inc. v. United States, 34 Fed. Cl. at 452 (granting plaintiff's motion to dismiss government's FCA counterclaims that were time-barred under the FCA six-year statute of limitations).

As noted above, Section 2415 sets general time-bars for the government to file contract, tort, or wage recovery actions in federal court. See 28 U.S.C. § 2415. The statute also states that "the provisions of this section [28 U.S.C. § 2415] shall not prevent the assertion" by the United States of a counterclaim under certain conditions. See 28 U.S.C. § 2415(f) (emphasis added). Subsection (f) does not address whether or not the government may bring counterclaims that are time-barred pursuant to other statutes of limitations, such as the FCA statute of limitations at 31 U.S.C. § 3731 (2012).

Whether defendant's proposed FCA counterclaims are potentially time-barred is determined by the FCA statute of limitations at 31 U.S.C. § 3731, which states that a "civil action" brought pursuant to the FCA may not be brought:

> (1) more than 6 years after the date on which the violation of section 3729 is committed, or

> (2) more than 3 years after the date when facts material to the right of action are known or reasonably should have been known by the official of the United States charged with responsibility to act in the circumstances, but in no event more than 10 years after the date on which the violation is committed,

whichever occurs last.

31 U.S.C. § 3731(b). In other words,

> [s]ix years . . . is the *minimum* statute of limitations period under the statute. . . . This six-year period may be increased by three years if the violation is not reasonably known after the date of the commission of the violation. . . . In any event, the statute of limitations cannot exceed ten years after the date that the violation was committed.

TS Infosys., Inc. v. United States, 36 Fed. Cl. at 572 (emphasis in original; internal citations omitted).

As previously noted, defendant states in its reply in support of its motion for leave to amend, and with which facts LW does not take issue, that LW submitted twenty-two invoices for payment to the VA on the Fort Jackson contract between 2009 and 2012, before the contract was terminated on October 16, 2013 and submitted three certified claims for payment to the VA contracting officer on February 17, 2015, September 15, 2015, and September 24, 2015, after the contract was terminated for default and after LW filed the above-captioned case. Defendant alleges in its reply that the twenty-two invoices and three certified claims for payments are each a false claim under the FCA, and thus, collectively, there are twenty-five potentially false claims. As to the timing of the twenty-five potentially false claims, defendant states in its reply in support of its motion

---

for leave to amend that seven of the twenty-five false claims, i.e., four invoices and three certified claims for payment, were submitted on or after October 13, 2011 and are, therefore, within the FCA six-year statute of limitations, working backwards from the date that defendant filed its motion for leave to amend the answer on October 13, 2017. The remaining eighteen false claims, which, according to the defendant's reply in support of its motion for leave to amend, were submitted before October 13, 2011, might be considered as untimely under the FCA statute of limitations. The FCA statute of limitations' "minimum limitations period" is six years in which to file from the date of the alleged violation, which, in the above-captioned case, is the date that LW submitted each of the twenty-two invoices and the three certified claims for payment to the VA on the Fort Jackson contract. See 31 U.S.C. § 3731(b)(1). Because six years had not passed from when LW filed its four invoices for payment, which allegedly each occurred "on or after October 13, 2011," and filed its three certified claims for payment to the VA in 2015, to when defendant filed its motion for leave to amend on October 13, 2017, defendant is not time-barred under the FCA statute of limitations from bringing these seven claims.

Defendant's FCA counterclaims for LW's eighteen pre October 13, 2011 submitted claims for payment submitted to the VA, normally would be time-barred under the FCA's six-year period for filing a claim under the FCA because each of these eighteen claims for payment were submitted by LW to the VA more than six years before defendant filed its motion for leave on October 13, 2017.[23] Nonetheless, according to defendant, the government could bring FCA counterclaims regarding these eighteen claims for payment pursuant to the FCA's statute of limitations tolling provision at 31 U.S.C. § 3731(b)(2), which states:

> A civil action under section 3730 may not be brought— . . . (2) more than 3 years after the date when facts material to the right of action are known or reasonably should have been known by the official of the United States charged with responsibility to act in the circumstances, but in no event more than 10 years after the date on which the violation is committed . . . .

31 U.S.C. § 3731(b)(2).

The FCA does not define "official of the United States charged with responsibility to act in the circumstances" referenced in 31 U.S.C. § 3731(b)(2).[24] Nor has case law

---

[23] As noted above, the Fraud Enforcement and Recovery Act, although enacted in 2009, was treated "as if enacted on June 7, 2008, and applies to all claims under the False Claims At (31 U.S.C. 3729 et seq.) that are pending on or after that date." See Fraud Enforcement and Recovery Act, § 4(f), 123 Stat. at 1625. As the Fort Jackson contract was awarded on June 2, 2009, all claims would be within the amended and current version of the FCA.

[24] The legislative history of the False Claims Amendment Act, the act which amended the FCA by adding 31 U.S.C. § 3731(b)(2), the tolling provision at issue, does not provide clarity as to the meaning of "official of the United States." The section of the relevant Senate Report states:

provided a clear answer as to which government official(s) qualifies as an "official of the United States charged with responsibility to act in the circumstances." A judge of this court previously held that the "official of the United States" refers to an official of the Civil Division of the DOJ. See Jana, Inc. v. United States, 34 Fed. Cl. at 451 n.6 ("[T]he discovery that triggers 31 U.S.C. § 3731(b)(2) is not knowledge of the fraud by *any* government official, but knowledge of the fraud by an official having the authority to initiate litigation under the Act, generally considered to be an official at the Civil Division of the Department of Justice, which has exclusive litigating authority under the False Claims Act, 31 U.S.C. § 3730(a)." (emphasis in original)).

Other judges in various federal courts, for example, are divided on whether the "official of the United States" refers specifically to an official within the Civil Division of the DOJ or to any government employee. Compare United States v. Macomb Contracting Corp., 763 F. Supp. 272, 274 (M.D. Tenn. 1990) ("The 'official of the United States charged with responsibility' could only have been the appropriate official of the Civil Division of the Department of Justice, which alone has the authority to initiate litigation under the Act."), with United States ex rel. Kreindler & Kreindler v. United Techs. Corp., 777 F. Supp. 195, 205 (N.D.N.Y. 1991) ("The facts material to relator's cause of action were known in 1979 by the senior [Army] officials in charge of the Black Hawk project. Thus, those facts were known, or reasonably should have been known, by officials with the responsibility to act.").

From the record before the court, the DOJ was alerted to LW's possible fraud on April 22, 2014, when the Mixsons provided their joint pre-filing disclosure statement regarding their proposed *qui tam* suit to the United States Attorney's Office in Columbia, South Carolina and to the Civil Fraud Division of the DOJ in Washington, D.C. and then on May 8, 2014, when the Mixsons filed their *qui tam* complaint in the United States District Court of the District of South Carolina. At that time, however, the DOJ concluded that the government would not join the Mixsons' *qui tam* suit and did not initiate action against LW based on the allegations of fraud. Pursuant to the tolling provision of the FCA statute of limitations, 31 U.S.C. § 3731(b)(2), the DOJ had three years from April 22, 2014 or May 8, 2014 to file FCA counterclaims regarding the eighteen claims LW submitted to

_____

Subsection (b) of section 3731 of title 31, as amended by section 3 of the bill, would include an explicit tolling provision on the statute of limitations under the False Claims Act. The statute of limitations does not begin to run until the material facts are known by an official within the Department of Justice with the authority to act in the circumstances.

S. Rep. No. 345, 99th Cong., 2d Sess. 30 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266, 5295 (emphasis added). In the same Senate Report, the Senate also used broader language, stating, "the subcommittee added a modification of the statute of limitations to permit the Government to bring an action within 6 years of when the false claim is submitted (current standard) or within 3 years of when the Government learned of a violation, whichever is later." S. Rep. No. 345 at 15, 1986 U.S.C.C.A.N. at 5280.

the VA before October 13, 2011, making the DOJ's statute of limitations filing deadline April 22, 2017 or May 8, 2017, both before defendant sought leave to amend its answer on October 13, 2017. Given the decision by the DOJ at the time, however, after review of the Mixsons' submissions and lawsuit, not to join the Mixsons' *qui tam* lawsuit, to agree to the dismissal of the *qui tam* lawsuit and not to initiate criminal prosecution, it might also be argued that the DOJ had concluded that there was insufficient evidence of fraud at that time on which to act, for which reason the statute of limitation did not begin to run.

When ruling on defendant's motion for leave to amend in the current case, the court is tasked to determine whether defendant's proposed counterclaims are timely under the applicable statute of limitations. The court also is tasked to determine whether defendant has unduly delayed in seeking leave to amend its answer to assert various counterclaims and an affirmative defense. This court acknowledges that statute of limitations normally are strictly applied with little or no discretion for the court. See Gabelli v. S.E.C., 568 U.S. 442, 448 (2013) (noting that the "'basic policies of all imitations provisions: repose, elimination of stale claims, and certainty about a plaintiff's opportunity for recovery and a defendant's potential liabilities.'" (quoting Rotella v. Wood, 528 U.S. 548, 555 (2000))); see also United States v. Kubrick, 444 U.S. 111, 117 (1979) ("Statute of limitations . . . represent a pervasive legislative judgment that it is unjust to fail to put the adversary on notice to defend within a specified period of time and that the right to be free of stale claims in time comes to prevail over the right to prosecute them." (internal quotations omitted)). As the Supreme Court cautioned, "the cases in which a statute of limitation may be suspended by causes not mentioned in the statute itself . . . are very limited in character, and are to be admitted with great caution; otherwise the court would make the law instead of administering it." Gabelli v. S.E.C., 568 U.S. at 454 (internal quotations omitted) (declining to "graft" a tolling provision onto the statute of limitations at 28 U.S.C. § 2462, the statute which sets the time period for the United States to file a civil penalty action in federal court). Contrastingly, as discussed above, whether a party has unduly delayed in seeking leave to file an amended pleading is subject to the discretion of the court, and, viewed, on a case by case basis, in the context of whether the amended pleading would cause undue prejudice. See Alaska v. United States, 15 Cl. Ct. at 280 ("[M]ere delay, without some showing of prejudice, bad faith, or futility is insufficient to deny a motion to amend a complaint.").

Based on the above, the court concludes that the government's FCA counterclaims stemming from LW's seven claims for payment submitted on or after October 13, 2011, are timely. The court, however, believes it is appropriate to bar defendant's FCA counterclaims relating to LW's eighteen claims for payment submitted before October 13, 2011 in accordance with the statute of limitations provisions in the FCA. The court does not condone the passage of time from the filing of LW's case on October 8, 2014 to October 13, 2017, when defendant's FCA counterclaims were first asserted, even given the statements of defendant's counsel in the case before the court that he accepted the earlier determination by his DOJ colleagues not to become part of the Mixsons' *qui tam* lawsuit and not to pursue criminal action. The court also cannot condone or dismiss the possibility that LW committed fraud, which the court believes must be addressed when

brought to the court's attention. Defendant's FCA counterclaims which were filed on or after October 13, 2011, therefore, will be reviewed.

### c.  Unjust enrichment counterclaim

Plaintiff also argues that defendant should not be allowed to amend its answer to include its proposed unjust enrichment counterclaim because the government may not assert a claim for unjust enrichment in cases in which "'an express contract already covers the same subject matter.'" (quoting Short Bros., PLC v. United States, 65 Fed. Cl. 695, 800 (2005)). Plaintiff argues that "[t]here is no question that an express contract exists in this case," referring to the Fort Jackson contract. Plaintiff states:

> The Government cannot argue that it has a claim for unjust enrichment because the express contract is void *ab initio* while at the same time basing its allegations that LW submitted false claims under the FCA and owes liquidated damages and reprocurement costs under the terms of the express Contract. The Government cannot claim there was a default under the express terms of the contract, and pursue claims for liquidated damages and reprocurement costs under express provision of the contract, but at the same time argue no contract exists and seek to pursue a different claim for unjust enrichment. The Claims are mutually exclusive and cannot co-exist.

(emphasis in original).

An "'unjust enrichment' claim generally exits when one party benefits at another's expense, and where allowing that party to retain that benefit would be inequitable." Copar Pumice Co. v. United States, 112 Fed Cl. 515, 538 (2013) (quoting Int'l Air Response v. United States, 75 Fed. Cl. 604, 612 (2007)). An "unjust enrichment claim is an equitable implied-in-law contract claim." Copar Pumice Co., v. United States, 112 Fed Cl. at 538. It is well-settled that this court has no jurisdiction over cases in which plaintiffs assert implied-in-law contracts. As the United States Court of Appeals for the Federal Circuit stated, "[j]urisdiction based on contract 'extends only to contracts either express or implied in fact, and not to claims on contracts implied in law.'" Trauma Serv. Grp. v. United States, 104 F.3d 1321, 1324 (Fed. Cir. 1997) (quoting Hercules, Inc. v. United States, 516 U.S. 417, 423 (1996)); Aetna Cas. & Surety Co. v. United States, 228 Ct. Cl. 146, 164, 655 F.2d 1047 (1981). The government, however, may bring an implied-in-fact contract claim, such as an unjust enrichment claim, as a counterclaim in this court pursuant to 28 U.S.C. § 1503 (2012), which states, "[t]he United States Court of Federal Claims shall have jurisdiction to render judgment upon any set-off or demand by the United States against any plaintiff in such court." 28 U.S.C. § 1503; see also MW Builders, Inc. v. United States, 134 Fed. Cl. 469, 512 (2017). The government may also bring an implied-in-fact contract claim pursuant to 28 U.S.C. § 2508 (2012), which states:

> Upon the trial of any suit in the United States Court of Federal Claims in which any setoff, counterclaim, claim for damages, or other demand is set up on the part of the United States against any plaintiff making claim against

the United States in said court, the court shall hear and determine such claim or demand both for and against the United States and plaintiff.

28 U.S.C. § 2508. The United States Court of Appeals for the Federal Circuit has recognized that, "the Court of Federal Claims' Tucker Act jurisdiction does not extend to claims based on an implied-in-law contract. However, 28 U.S.C. §§ 1503 and 2508 provide the court with jurisdiction if the government brings such a claim as a counterclaim." Barrett Refining Corp. v. United States, 242 F.3d at 1062 (finding that Court of Federal Claims had jurisdiction over government's counterclaim seeking to recover payments it made to jet supplier which were allegedly unauthorized); see also BLH Inc. v. United States, 13 Cl. Ct. 265, 275 (1987) ("Although this court does not generally have jurisdiction over implied-in-law contracts, . . ., an exception exits for counterclaims for money damages asserted by the government." (citing to 28 U.S.C. § 1503 (1982))); Hamilton Secs. Advisory Servs. v. United States, 60 Fed. Cl. 144, 154 (2004) ("[T]he court properly has jurisdiction over a counterclaim based on restitution." (citing 28 U.S.C. §§ 1503, 2508)).

Plaintiff cites to Short Brothers, PLC v. United States, 65 Fed. Cl. 695 to argue that due to the express Fort Jackson contract, defendant cannot now raise an unjust enrichment claim. Contrary to the facts in Short Brothers, PLC v. United States, the government is not alleging in its proposed amended answer that it entered into an implied-in-fact contract with plaintiff, and that pursuant to such an implied-in-fact contract, it seeks to recover the alleged payments made to LW under the Fort Jackson contract. Instead, the government alleges in its proposed amended answer and in its supplemental brief in support of its motion for leave to amend that the contract at issue in the above-captioned case, the Fort Jackson contract, was obtained fraudulently by LW because LW mispresented its SDVOSB status when it bid on the Fort Jackson contract and that the contract can be considered void ab initio.[25] Therefore, the government alternatively

---

[25] A contract tainted with fraud is "void ab initio." Long Island Sav. Bank, FSB v. United States, 503 F.3d 1234, 1245 (Fed. Cir. 2007) ("[T]he general rule is that a Government contract tainted by fraud or wrongdoing is void *ab initio*." (emphasis in original) (quoting Godley v. United States, 5 F.3d 1473, 1476 (Fed. Cir. 1993))); see also J.E.T.S., Inc. v. United States, 838 F.2d 1196, 1200 (Fed. Cir. 1988) ("A government contract thus tainted from its inception by fraud is void *ab initio* . . . ." (emphasis in original)). As a judge of this court explained:

A contract may be said to be void from the start where there exists a disability of the sort that would preclude the parties' exchange of promises from giving rise to an enforceable engagement. Thus, contracts executed in the absence of contractual authority or in violation of statutory controls placed on the procurement process can be said to be void *ab initio*.

Ab-Tech Constr., Inc. v. United States, 31 Fed. Cl. 429, 434 (1994) (emphasis in original) (finding in that case that there was not a "threshold infirmity" to the establishment of the contract at issue that would render the contract void ab initio); see also J.E.T.S., Inc. v.

alleges in its proposed amended answer that "LW's fraudulent and wrongful conduct in obtaining the award of the Fort Jackson Contract and payments under that contract resulted in LW's unjust enrichment in an amount to be determined at trial." As previously noted, the government may assert an unjust enrichment counterclaim in this court pursuant to 28 U.S.C. §§ 1503, 2508. See Barrett Refining Corp. v. United States, 242 F.3d at 1062; see also BLH Inc. v. United States, 13 Cl. Ct. at 275; Hamilton Secs. Advisory Servs. v. United States, 60 Fed. Cl. at 154. Thus, here, the government, unlike the plaintiff asserting the unjust enrichment claim in Short Brothers, PLC v. United States, is seeking recovery under an unjust enrichment theory because the Fort Jackson contract, the express contract at issue in the above-captioned case, has allegedly been voided ab initio due to LW's fraudulent misrepresentation of its SDVOSB status when it bid on and was awarded the Fort Jackson contract.

Also, contrary to plaintiff's assertion that the government cannot "claim there was a default" under the Fort Jackson contract, but at the same time "argue no contract exists and seek to pursue a different claim for unjust enrichment," it is well-established that a party to litigation, including the government, may assert alternative theories of recovery. According to RCFC 8(d)(3), "[a] party may state as many separate claims or defenses as it has, regardless of consistency." RCFC 8(d)(3) (2018); see also Stockton E. Water Dist. v. United States, 583 F.3d 1344, 1368 (Fed. Cir. 2009) ("[T]he fact that the theories may be inconsistent is of no moment."). Further, according to RCFC 8(d)(2), a "party may set out 2 or more statements of a claim or defense, alternatively or hypothetically, either in a single count or defense or in separate ones." RCFC 8(d)(2). Based on the government's proposed amended answer, the government is offering separate theories of recovery. If defendant's proposed amended answer is allowed, the government's counterclaims include its unjust enrichment counterclaim, common law fraud counterclaim, and FCA counterclaims, based on:

> LW's submission of false claims or false statements, or causing the submission of false claims or false statements, regarding LW's eligibility as a Service-Disabled Veteran-Owned Small Business (SDVOSB), which was a requirement to obtain the contract for the construction of Phase 1B of the Fort Jackson National Cemetery, Contract Number VA101CFMC-0042 (the Fort Jackson Contract) and to obtain payments under that contract.

The government also counterclaims for liquidated damages and reprocurement costs stemming from LW's failure to complete the Fort Jackson contract on time, which the government had previously asserted in its earlier filed amended answer on January 21, 2016.[26] That the government is seeking relief under multiple, separate theories of

---

United States, 838 F.2d at 1200 (finding that contract was "procured by and therefore permeated with fraud" when contract knowingly and falsely stated that it was a small business and, thus, holding that the contract was void ab initio).

[26] Defendant, in its January 21, 2016 answer styled its request for liquidated damages and reprocurement costs as a single counterclaim. Defendant, however, in its proposed

recovery is permitted under the Rules of the Court of Federal Claims. See RCFC 8(d). The court, at this time, does not evaluate the merits of defendant's various claims, but recognizes the government cannot succeed under all of its theories of recovery.

Plaintiff also argues that even if the court permits leave to amend the answer to allow the unjust enrichment counterclaim, the government's unjust enrichment counterclaim will nonetheless fail, and, thus, be futile because "no basis in fact exists for a government counterclaim of unjust enrichment." In particular, plaintiff states that "[t]he Government cannot prove that it conferred any unearned benefit on LW because the Government did not pay LW more than the value of the work performed," and that "[i]n fact, the Government did not pay LW for all of the work performed by LW under the contract." Defendant responds in its supplemental brief filed in support of its motion for leave to amend that "our unjust enrichment claim is based upon LW's receipt of $10,792,236.20 in contract payments made pursuant to its illegally obtained contract."

To succeed on a claim of unjust enrichment, a party must establish,

"(1) a benefit conferred on the [plaintiff] by the [aggrieved party]; (2) an appreciation or knowledge by the [plaintiff] of the benefit; and (3) the acceptance or retention by the [plaintiff] of the benefit under such circumstances as to make it inequitable for the [plaintiff] to retain the benefit without payment of its value." 26 Richard A. Lord, Williston on Contracts § 68:5 (4th ed.).

Int'l Air Response v. United States, 75 Fed. Cl. at 612 (alterations in original apart from second alteration; footnote omitted). Regarding the elements of an unjust enrichment claim, that an unjust or inequitable benefit be conferred to plaintiff and that plaintiff had an "appreciation or knowledge" of the benefit, defendant alleges in its proposed amended answer that LW "acted knowingly when misrepresenting its SDVOSB eligibility for the Fort Jackson contract," received "$10,792,236.20 in contract payments," under the Fort Jackson contract, and that retaining the benefit would be "inequitable." Defendant alleges in its proposed amended answer that,

companies that did not meet the criteria to an SDVOSB were not eligible to obtain the Fort Jackson Contract. Had LW not misrepresented its status as qualified SDVOSB by self-certifying its eligibility on ORCA and Vetbiz.gov, and in submitting the bid for the Fort Jackson Contract, the VA would not have awarded LW the Fort Jackson Contract or paid invoices submitted by LW pursuant to that contract.

Defendant further alleges that, "[b]y reason of the payments to [sic] defendants [sic], LW was unjustly enriched. The circumstances of LW's receipt of the contracts at issue are such that, in equity and good conscience, LW is liable to account for and pay such

---

amended answer currently before the court, styles its request for liquidated damages and reprocurement costs as two separate counterclaims.

amounts, which are to be determined at trial." At this stage of the proceedings, defendant has sufficiently alleged the elements for an unjust enrichment claim based on a benefit possibly knowingly received, retained, and which potentially unjustly or inequitably bestowed benefits to the receiving party.

Whether and to what extent plaintiff performed on the contract does not automatically invalidate the government's allegation that LW was unjustly enriched on the Fort Jackson contract. The government has a right to try to recover the amounts paid to a contractor, as defendant seeks to do in the above-captioned case, on a contract if it was allegedly fraudulently obtained. See K & R Eng'g Co. v. United States, 222 Ct. Cl. 340, 353, 616 F.2d 469, 475 (1980) (finding that the government was entitled to recover amounts paid to a contractor pursuant to contracts that were procured as a consequence of a contractor's participation in an arrangement prohibited by a conflict of interest statute).[27] The Court of Claims explained in K & R Engineering Co. v. United States, 222 Ct. Cl. 340, 616 F.2d 469:

_____

[27] In Veridyne Corp. v. United States, a Court of Federal Claims Judge stated that, "[f]orfeiture is an inappropriate remedy for common-law fraud except when a conflict of interest is perpetuated by a contractor involved in facilitating and maintaining a Government agent's conflict of interest or where an agent of the contractor obtains a contract through a conflict of interest." Veridyne Corp. v. United States, 83 Fed. Cl. 575, 586 (2008). The Veridyne court held that because defendant had not alleged a conflict of interest in that case, "plaintiff would not be liable for the amount of $31,134,931.12, representing forfeiture of all monies paid under Mod 0023, or forfeit its claim for unpaid invoices." Id. This court, however, is not bound by the narrow conclusion of another Court of Federal Claims judge in Veridyne Corp. v. United States that the government may not recover monies paid to a contractor as a remedy for common law fraud absent allegations of bribery or conflicts of interest. Further, despite the Veridyne court's narrow conclusion, the Veridyne court acknowledged that the Federal Circuit in United States v. Amdahl Corp. 786 F.2d 387 (Fed. Cir. 1986) more broadly stated that "fraud in the procurement" of a contract, and not just narrow instances of bribery or conflicts-of-interest, could potentially prevent recovery by a contractor for services already rendered. Id. ("The Federal Circuit did recognize the rule that fraud in the procurement could obviate recovery." (citing United States v. Amdahl Corp., 786 F.2d 387, 395 n.8 (Fed. Cir. 1986))). In United States v. Amdahl Corp., 785 F.2d 387, the Federal Circuit explained that,

> in many circumstances it would violate good conscience to impose upon the contractor _all_ economic loss from having entered an illegal contract. Where a benefit has been conferred by the contractor on the government in the form of goods or services, which it accepted, a contractor may recover at least on a _quantum valebant_ or _quantum meruit_ basis for the value of the conforming goods or services received by the government prior to the rescission of the contract for invalidity. The contractor is not compensated _under_ the contract, but rather under an implied-in-fact contract.

Id. at 393 (emphasis in original; footnote omitted). Notably, in Amdahl, the contract at issue was deemed invalid because of the failure of a contracting officer to comply with

In addition to opposing plaintiff's claim for the balance due under the barge contract, the United States has counterclaimed to recover the amount it already paid plaintiff under that contract and the amounts it previously paid under the bulkhead 25 and 26 contracts. The government is entitled to recover on its counterclaims. The protection of the integrity of the federal procurement process from the fraudulent activities of unscrupulous government contractors and dishonest government agents requires a refund to the government of sums already paid the plaintiff no less than it requires nonenforcement of the contract not yet completed.

. . .

Permitting the contractor to retain amounts already received would create the danger that "(m)en inclined to such practices, which have been condemned generally by the courts, would risk violation of the statute knowing that, if detected, they would lose none of their original investment, while, if not discovered, they would reap a profit for their perfidy."

Id. at 340 (quoting Town of Boca Raton v. Raulerson, 146 So. 576, 577 (Fla. 1933)). Similarly, the United States Court of Appeals for the Federal Circuit in J.E.T.S., Inc. v. United States, 838 F.2d 1196 upheld the Armed Services Board of Contract Appeals' decision denying a contractor's recovery of payment under a government contract because the contractor fraudulently procured the contract by misrepresenting its status as a small business. See J.E.T.S., Inc. v. United States, 838 F.2d at 1201. In particular, the Federal Circuit stated:

J.E.T.S. obtained this contract by knowingly falsely stating that it was a small business. Had it stated the truth about its size, it would not have received the contract. A government contract thus tainted from its inception by fraud is void *ab initio,* like the government contracts held void because similarly tainted by a prohibited conflict of interest in United States v. Mississippi Valley Generating Co., 364 U.S. 520, 81 S. Ct. 294, 5 L. Ed. 2d 268 (1961), and K & R Eng'g Co. v. United States, 616 F.2d 469, 222 Ct. Cl. 340 (1980).

---

statutory requirements in making the award of the contract at issue, not because of fraudulent conduct by the contractor. See id. at 392. Further, the Amdahl court acknowledged that "[t]he remedy" of payment for services rendered "may be different in a case involving fraud or the like, a matter not involved here." Id. at 395 n.8 (citing K & R Eng'g Co. v. United States, 222 Ct. Cl. 340, 616 F.2d 469). Defendant in the above-captioned case has not alleged any instances of bribery or a conflict of interest. Defendant, however, does specifically allege that there was fraud in the procurement of the Fort Jackson contract, namely that plaintiff fraudulently induced the award of the Fort Jackson contract by fraudulently misrepresenting its SDVOSB status when it submitted its proposal for the Fort Jackson contract and was awarded the contract.

> If in the first appeal the Board had been aware of J.E.T.S.' fraud in obtaining the contract, the Board would not have held that J.E.T.S. was entitled to an equitable adjustment for the government's constructive change in the contract. The Board correctly stated in the present appeal, "to permit recovery of any further monies under the circumstances would be an affront to the integrity of the federal procurement process." See Mississippi Valley, 364 U.S. at 564–65, 81 S. Ct. at 316–17. "The protection of the integrity of the federal procurement process from the fraudulent activities of unscrupulous government contractors," K & R Eng'g, 616 F.2d at 476, fully supported—indeed, required—denial of J.E.T.S.' claim for additional compensation once J.E.T.S.' fraud in obtaining the contract was disclosed. This is so even though, when the fraud was not yet known, the Board earlier had determined that J.E.T.S. was entitled to additional money.

J.E.T.S., Inc. v. United States, 838 F.2d at 1200 (emphasis in original). Thus, contrary to plaintiff's position, whether and to what extent plaintiff performed on the contract is not dispositive to defendant's claim to recover costs paid to plaintiff on the Fort Jackson contract, if it was, as alleged, procured by fraud.

Plaintiff further argues that the government's proposed unjust enrichment claim is time-barred by the general six-year statute of limitations for claims brought before the United States Court of Federal Claims set forth in 28 U.S.C. § 2501. According to plaintiff's response brief, the cause of action giving rise to its unjust enrichment counterclaim "accrued when LW submitted its proposal and was awarded the contract in 2009," and that more than six years has passed since 2009.  As it did regarding its proposed common law fraud counterclaim, the government responds that 28 U.S.C. § 2501 does not apply to its unjust enrichment claim. As discussed above with regard to the futility of the government's proposed common law fraud counterclaim, the statute of limitations set forth in 28 U.S.C. § 2501 only applies to claims brought against the government, not to counterclaims brought by the government, such as the government's proposed unjust enrichment counterclaim. See Rhoades v. United States, 222 Ct. Cl. at 613; see also Dugan & McNamara, Inc. v. United States, 130 Ct. Cl. at 611. Therefore, the statute of limitations set forth in 28 U.S.C. § 2501 does not apply to the government's proposed unjust enrichment counterclaim.

Plaintiff also argues that the government's proposed unjust enrichment counterclaim is futile because it is time-barred by the six-year statute of limitations for claims founded upon a contract brought by the United States in any federal court set forth in 28 U.S.C. § 2415(a). Defendant responds that 28 U.S.C. § 2415(f) specifically exempts the government from the six-year statute of limitations set forth in 28 U.S.C. § 2415(a) in this case because defendant's unjust enrichment counterclaim is "related to the 'same transaction or occurrence' that gave rise to LW's challenge to the termination for default." Moreover, defendant argues that, "even if unrelated," it is still entitled to bring its unjust enrichment claim to offset LW's potential recovery under 28 U.S.C. § 2415(f).

As discussed above, 28 U.S.C. § 2415(a) imposes a six-year period for the United States to file a claim "for money damages" which is "founded upon any contract express or implied in law or fact." 28 U.S.C. § 2415(a). The government is seeking to assert a counterclaim for unjust enrichment, which, as previously noted, "is an equitable implied-in-law contract claim," Copar Pumice Co. v. United States, 112 Fed Cl. at 538, and, thus, absent the exemption under 28 U.S.C. § 2415(f), subject to the six-year statute of limitations for contract actions under 28 U.S.C. § 2415(a). See United States v. Intrados/Int'l Mgmt. Grp., 265 F. Supp. 2d at 12 (holding that the government's unjust enrichment claim was subject to the six-year statute of limitations for contract actions under 28 U.S.C. § 2415(a)). As discussed previously, under 28 U.S.C. § 2415(a) if the contract claim being sought is a counterclaim related to the "same transaction or occurrence" of the subject matter at issue in the suit, pursuant to 28 U.S.C. § 2415(f), the government may bring its counterclaim. See Jana, Inc. v. United States, 34 Fed. Cl. at 452 ("Because the counterclaims arise from the same contracts as plaintiff's claims, they are not subject to any statute of limitations."). Based on the record before the court, the government's unjust enrichment counterclaim seeks recovery for alleged payments by the government to LW on the Fort Jackson contract. The government alleges in its proposed amended answer that it is entitled to recover its payments to plaintiff on the Fort Jackson contract because plaintiff allegedly fraudulently obtained the contract by misrepresenting its SDVOSB status when it bid on the Fort Jackson contract. According to defendant, allowing plaintiff to retain such payments, which were improperly obtained, would be unjust. The court finds that the government's unjust enrichment claim does arise from the same transaction or occurrence giving rise to plaintiff's complaint, namely the Fort Jackson contract, and is exempt from the six-year statute of limitations under 28 U.S.C. § 2415(a) by virtue of 28 U.S.C. § 2415(f), and thus, is not time-barred. The court finds that the government sufficiently has pled its unjust enrichment claim.

## II.    Timeliness.

In addition to LW's assertions regarding plaintiff's alleged statute of limitations hurdles and plaintiff's allegations that defendant's proposed counterclaims and affirmative defense cannot survive a motion to dismiss, plaintiff argues that defendant's motion for leave to amend should be considered untimely because of previous interactions between the VA and LW regarding LW's SDVOSB status, which dates back more than six years, and long before the case currently before the court was filed on October 8, 2014. As indicated above, plaintiff argues that defendant's motion for leave to amend is untimely because,

> [t]he government's motion was filed more than six (6) years after the VA had determined LW was not an eligible SDVOSB; more than four (4) years after the contracting officer "reported" LW over concerns with its SDVOSB certification; more than three (3) years after the DOJ declined to intervene in the Mixson Qui Tam action; and almost exactly three (3) years since the original Complaint in this case was filed.

The court notes that the earliest defendant would have asserted the common law fraud affirmative defense and four counterclaims, which defendant is currently seeking to assert by its motion for leave to amend its answer was when defendant filed its original answer in the case on December 8, 2014. Plaintiff states in its sur-reply to defendant's motion for leave to amend that "had the claims [currently at issue in defendant's motion for leave to amend] been asserted in a timely manner – when the Government answered LW's Complaint in December 2014 – the disposition of those claims would have been a threshold issue in this litigation."

As of December 8, 2014, when defendant filed its original answer, the evidence in the record before the court suggests that certain, as yet unidentified, DOJ personnel, in the United States Attorney's Office in Columbia, South Carolina and Washington, D.C. were informed of possible questions raised about LW's SDVOSB status when, on April 22, 2014, the Mixsons, shareholders of one of LW's subcontractors, Landmark Construction Company, notified both the United States Attorney's Office in Columbia, South Carolina and DOJ personnel in Washington, D.C. that they were intending to file a *qui tam* suit, and then on May 8, 2014, when the Mixsons filed their *qui tam* complaint in the United States District Court for the District of South Carolina.[28] The Mixsons' joint pre-

---

[28] The court notes that according to the Mixsons' joint pre-filing disclosure statement submitted to the United States Attorney's Office and the Civil Fraud Division of the DOJ, the Mixsons had alleged that not only Gary Brantley, but also Sidney Brantley, played an active role in the Mixsons' separate Miller Act case against LW, seeking to recover charges that Landmark Construction Company alleged it was owed by LW as its subcontractor on the Fort Jackson contract. According to the Mixsons' joint pre-filing statement:

> We believe that perhaps the best indicia of management and control of LW by the Brantley Brothers is the manner in which this suit [the Miller Act case] has been handled. Although the Brantley Brothers, individually, and their corporations are not named in the Miller Act case, they have assumed complete control over the matter and Mr. White is noticeably absent.

> On March 11, 2014, Gary and Sid Brantley paid a personal visit on us. We recorded the conversation and it is attached as **Exhibit F.** This conversation clearly establishes the Brantley's comprehensive control over the affairs of LW. Additionally, the Brantley Brothers acknowledge that they have "lost money" and invested substantial sums into LW. On April 21, 2014, the Brantley Brothers visited us again and reiterated many of the same concerns. That recorded conversation is likewise attached as **Exhibit G** and provides additional proof as to the true management, operation and control of LW. Mr. White was not present for any of these meetings and has, since the financial reversals on the cemetery project, had no

filing disclosure statement was submitted together with eleven exhibits. For example, the Mixsons alleged in their joint pre-filing statement that the Brantley brothers were involved in LW's subcontract formation because they "were presented a modified AIA subcontract document . . . which was actually, a modified standard subcontract template document of Brantley Construction," and attached the subcontract and the Brantley subcontract template as exhibits. The Mixsons also alleged in their joint pre-filing disclosure statement that the Brantley brothers managed and controlled LW, and attached exhibits consisting of "organizational documents" and "licensing documents" obtained from the South Carolina Secretary of State and South Carolina Department of Labor, License, and Regulation, which according to the Mixsons, demonstrated that "the original organizers of LW were Louis White, Gary Brantley and Sidney Brantley." The Mixsons also alleged in their joint pre-filing statement that "Mr. White is not the license qualifier for the corporation," and that according "to the public records of the License Authority of South Carolina, Sid Brantley held himself out as 'Owner President' of LW." The Mixsons' lawsuit further included allegations that LW fraudulently had misrepresented its SDVOSB status when it bid on the Fort Jackson contract, as follows:

> In 2008, the Brantley Brothers conspired with Louis White to establish a Limited Liability Company to obtain SDVOSB status and compete for SDVOSB set-aside contracts. In furtherance of this enterprise, these individuals established the defendant LW. LW held itself out at all times as a corporation which was owned, operated, managed and controlled by White; however, at all times relevant to the allegations of this complaint, LW was, in reality, operated, managed, and controlled by and through the Brantley Brothers and/or the Brantley Entities.

Moreover, the Mixsons alleged in their *qui tam* complaint that, "[o]n or about June 2, 2009, LW and the other Defendants falsely and fraudulently entered into a SDVOSB set-aside contract in the amount of $10,273,000.00 with the United States for the construction of the Fort Jackson National Cemetery in Columbia, South Carolina ('the Cemetery Project' (Project VA101CFMC0042))."

Defendant did not assert its common law fraud affirmative defense, its common law fraud counterclaim, FCA counterclaims, or unjust enrichment counterclaim in its original December 8, 2014 answer or in its first amended answer filed January 12, 2016. Based on the record before the court, there was an approximate two year and ten month time difference from December 8, 2014, when defendant's counsel, Mr. Lowry, the original DOJ attorney of record, filed defendant's original answer, to when defendant moved to amend its answer to include fraud counterclaims, an unjust enrichment counterclaim, and an affirmative defense on October 13, 2017. Defendant argues in its reply in support of its current motion for leave to amend that the Mixsons' *qui tam* suit was

---

involvement in the project whatsoever. It is apparent to us that LW is a mere sham front for Brantley.

(emphasis in original).

determined by the "Civil Division [of the DOJ]" at the time the Mixsons filed their *qui tam* complaint to be based on "allegations" brought by a "disgruntled subcontractor." DOJ counsel asserts that he had no reason to dispute the contemporaneous conclusion by the DOJ not to join the *qui tam* suit or to file fraud charges against LW until he conducted discovery and, more importantly, when the depositions began in the above-captioned case during the week of November 14, 2016. In fact, DOJ counsel indicates that after conferring with the United States Attorney's Office in Columbia, South Carolina in November of 2015 regarding the DOJ's decision to decline to intervene in the Mixsons' *qui tam* action, "we [the government] did not believe there was much evidence of fraud and initially concluded the fraud claims need not be pursued," which was consistent with the conclusion by the United States Attorney's Office in Columbia, South Carolina not to intervene in the Mixsons' *qui tam* suit. Moreover, the United States previously also concluded that once filed, the Mixsons' *qui tam* suit in federal district court was not meritorious, and consented to its dismissal by the Mixsons. According to the United States' notice of consent to the Mixsons' voluntary dismissal, the Mixsons "filed a stipulation of voluntary dismissal," in their *qui tam* action on August 17, 2015 and the government consented to the dismissal "so long as the dismissal is without prejudice to the United States." In defendant's reply in support of its motion for leave to amend, the DOJ counsel first assigned to the above-captioned case as attorney of record indicates that he did not review critical documents from the CVE and VA's OIG until March 2017, during discovery in the current case. Defendant argues that, as discovery progressed, DOJ reassessed the appropriateness of asserting fraud counterclaims, an unjust enrichment counterclaim, and an affirmative defense of common law fraud based on newly identified evidence and further evaluation of such evidence during depositions taken in the current case.

According to the government, the DOJ "renewed its investigation into LW's SDVOSB status," after "attending the first deposition taken by LW, on November 15, 2016, and meeting Louis White and Gary Brantley." DOJ counsel indicates that the defendant began "to suspect that it was more likely than not that the Brantleys exercised control over both the ultimate decision making of LW as well as Mr. White," in part because "counsel for LW insisted on the attendance of Gary Brantley at the depositions." The government also argues in its reply in support of its motion for leave to amend that LW's alleged fraud became clearer when "LW responded to our discovery request by refusing to provide documents related to its SDVOSB status, with the exception of its proposal." LW responded to the government's requests for documents related to LW's SDVOSB status by stating that, "LW objects to this request for production because it is overly broad and seeks documents that are not relevant or reasonably intended to lead the discovery of relevant information relating to any claim or defense in this case." As discussed above, according to the government, "[a]fter receiving LW's response, we began the process to obtain authority for the fraud counterclaim within the Department of Justice, which required the coordination with and approval from multiple sections of the Department." Based on the record before the court, there is no reason to doubt the representations made to the court by Mr. Lowry and Ms. Murdock-Park, defendant's counsel. It was not unreasonable for Mr. Lowry, the DOJ counsel of record at the time, initially, to accept the previously determined conclusions of the various DOJ colleagues

who chose not to join the Mixsons' *qui tam* suit and not to pursue criminal action against LW and its personnel at the time. Moreover, defendant counsel's representation that the depositions and further document production made him reconsider how to proceed has not been refuted and appears at this time to be sincere.

### III.    Potential prejudice to LW of defendant's motion for leave to amend.

Another consideration when trying to determine whether to grant defendant's motion for leave to amend its answer to assert an affirmative defense of common law fraud, fraud counterclaims, and an unjust enrichment counterclaim at this time, approximately two years and ten months after defendant filed its original answer on December 8, 2014 in the above-captioned case, is whether granting defendant's motion for leave at this time would be unduly prejudicial to plaintiff. The government argues that any delay in seeking to add its proposed counterclaims and affirmative defense is not unduly prejudicial to LW because as of yet, "there is no date [re]scheduled for trial, and LW was put on notice through the Government's discovery requests and deposition questions that issues of fraud might be raised." The government also cites to Veridyne Corp. v. United States, 86 Fed. Cl. 668, as support for a finding that plaintiff will not be unduly prejudiced if its motion for leave to amend is granted.

In Veridyne Corp. v. United States, 86 Fed. Cl. 668,[29] Veridyne, a government contractor filed a complaint in February 2006 against the government for unpaid invoices related to a contract modification with the Department of Transportation, Maritime Administration (MARAD), under the SBA's set-aside program. See Veridyne Corp. v. United States, 86 Fed. Cl. at 669. In order for the contract modification at issue in Veridyne to be awarded to Veridyne without open competition, pursuant to SBA regulations, the modification could not exceed $ 3 million in value. See id. at 672. In July of 2006, the government in the Veridyne lawsuit initially "asserted as a defense a special plea in fraud," and also counterclaimed under the Special Plea in Fraud statute, alleging that the contractor had fraudulently obtained the contract modification by vastly understating the value of total services that MARAD would be ordering. See id. at 670. The government then amended its pleadings by motion in November of 2006, which "were minor, non-substantive changes to its answer and counterclaim." See id. at 669. Almost three years after the original complaint by Veridyne had been filed, and approximately two and half years since defendant had filed its original answer and counterclaim, on February 18, 2009, defendant filed a "motion to amend its answer to include additional fraud counterclaims" under the Special Plea in Fraud statute, the Contract Disputes Act, and the FCA "'based upon newly-discovered fraudulent statements in plaintiff's invoices.'" Veridyne Corp. v. United States, 86 Fed. Cl. at 671 (quoting Veridyne defendant's brief). In determining whether to grant defendant's motion, the Veridyne court considered whether defendant had unduly delayed in filing its motion for leave and the extent of prejudice plaintiff would potentially suffer if defendant's motion was granted. Regarding undue delay, defendant argued that "the DOJ was not aware of the facts pertaining to the

---

[29] The court notes that this is a separate Veridyne case from Veridyne Corp. v. United States, 83 Fed. Cl. 575, which was distinguished above.

false funding claims until on or about July 31, 2008," two and half years after the original answer, approximately seven months before it filed its motion for leave and when agency counsel "'briefed him on the funding facts and circumstances surrounding [plaintiff's] funding misstatements.'" Id. at 678 (quoting Veridyne defendant's brief) (alterations in original). Defendant also argued that the "DOJ is mindful of the 'seriousness of the [fraud] allegations,' . . . thus, DOJ 'proceed[ed] cautiously in the assertion of these claims, in consultation with fraud experts.'" Id. at 680 (quoting Veridyne defendant's brief). The Veridyne court, however, concluded that defendant had not justified its delay in "reviewing and verifying the invoices at issue," that were contested by the parties and at issue in the parties' initial cross-motions for partial summary judgment in the case filed in 2006. See id. at 679. The Veridyne court, nonetheless, granted defendant's motion for leave to amend because it found that plaintiff had failed to carry its burden to show that it would be "substantially prejudiced" if the court were to allow defendant to amend its answer and assert its additional fraud counterclaims. See id. at 681.

In particular, plaintiff argued in Veridyne that, as "a small business, it will be substantially prejudiced by defendant's amendment of its answer because protracting litigation will result in additional costs and investment of time and will handicap plaintiff's ability to prove and defend the fact-intensive claims, given the 'fading memories' of its witnesses." Id. at 680 (quoting Veridyne plaintiff's brief). The court in Veridyne stated that,

> the burden to demonstrate prejudice is plaintiff's, and plaintiff has not substantiated how fading memories or absent documents would cause evidentiary prejudice to plaintiff, particularly because discovery was not scheduled to close until September 26, 2008. The cost, even to plaintiff as a small business, and burden of undertaking additional discovery do not substantiate the level of prejudice needed to overcome the liberal standard of RCFC 15(a)(2). The claims of prejudice put forth by plaintiff relate to allegedly new facts; consequently, at the least, the court must allow defendant to amend its proposed cause of action pursuant to the False Claims Act, 31 U.S.C. §§ 3729(a)(1), (a)(2), which is a new cause of action not based on newly asserted facts. The court would be inclined to deny defendant's motion to amend pursuant to the False Claims Act, 31 U.S.C. §§ 3729(a)(1), (a)(2); the CDA, 41 U.S.C. § 604; and 28 U.S.C. § 2514 based on alleged false funding and overbilling claims if plaintiff's showing of prejudice had been more substantial. In view of all facts and circumstances, and the need to preserve already aging evidence, the court grants defendant's motion to amend its answer and counterclaim.

Id. at 681 (internal reference omitted).

Regarding defendant's current motion before this court for leave to amend its answer, plaintiff argues, not only that "additional discovery" will need to take place, but, according to plaintiff, "discovery will essentially start over again," if the government's motion is granted. Plaintiff argues that the government's proposed counterclaims and affirmative defense would fundamentally alter the nature of the current case, resulting in

"[c]ompletely new discovery." According to plaintiff, the claims filed by plaintiff are for wrongful termination of the Fort Jackson contract, entitlement to monies under the changes clause, and breach of contract by the defendant, as well as plaintiff's opposition to defendant's counterclaim of liquidated damages and reprocurement costs for the Fort Jackson contract, all of which stem from LW's award and performance on the Fort Jackson contract. Plaintiff alleges in its response brief that it will have to re-depose at least five witnesses, including the two contracting officers and three contracting personnel involved in the Fort Jackson contract, regarding the issue of LW's alleged misrepresentation of its SDVOSB status. Moreover, plaintiff points out that after defendant already had begun the process of internally seeking to pursue the fraud counterclaims and affirmative defense of fraud, defendant took the depositions of eight of plaintiff's witnesses between July 2017 and September 2017. According to plaintiff, the government did not depose any of LW's witnesses regarding LW's alleged fraudulent misrepresentation of its SDVOSB status. Defendant's counsel responds that he did not receive internal DOJ approval to pursue fraud counterclaims and an affirmative defense until September 18, 2017, which was after most of the depositions occurred in the above-captioned case. According to defendant, because of upcoming and previously set fact discovery deadlines, the government decided to proceed with depositions of LW's witnesses on the issues in the case at that time, which would remain in the case regardless of whether defendant's motion for leave to amend was granted or not.

In LW's case, given the history surrounding its SDVOSB status, it is difficult for LW to claim unfair surprise or prejudice. Although not previously pled by defendant, LW should have anticipated the possibility, based on previous interactions with the government, that the affirmative defense and counterclaims relating to LW's alleged fraud could be inserted into the case by defendant. The parties disclosed to the court in the Joint Preliminary Status Report filed in the current case on January 26, 2015 that there was a criminal investigation being conducted at that time into "LW's status as a SDVO SB," and that defendant stated it would seek a stay in the current case if it eventually concluded that it was "necessary to assert any fraud counter-claims." With the filing of defendant's answer and subsequent answer to the amended complaint, and the passage of time, perhaps LW considered the risk of facing fraud counterclaims had diminished or passed. Nonetheless, LW should not be surprised that the government takes seriously its responsibility to confront and pursue possibly fraudulent activity by a contractor.

The court also acknowledges that when a party files a motion for leave to amend a pleading in a proceeding, in this case defendant's answer, there should be an inquiry as to whether prejudice will result to the non-moving party if the motion is granted. See King v. United States, 119 Fed. Cl. at 55. The role of the court, however, is to balance the prejudice to the non-moving party as a result of the passage of time with the basis and justification offered by the moving party for amending. As noted above, allegations of government contract fraud are particularly difficult to ignore. See Hanover Ins. Co. v. United States, 134 Fed. Cl. at 61 (granting government's motion for leave to amend in three of four consolidated cases to assert a Special Plea in Fraud defense, and fraud counterclaims under the Contract Disputes Act and under the FCA); Veridyne Corp. v. United States, 86 Fed. Cl. at 681 (granting government's motion for leave to amend its

answer and assert fraud counterclaims pursuant to the Special Plea in Fraud statute, Contract Disputes Act and FCA).[30]

---

[30] The court, however, is not suggesting that the government always should be allowed a free pass to assert any fraud related counterclaims or affirmative defenses regardless of its delay in seeking leave from the court to amend its answer. The facts of each particular case must control. The court recognizes that there are certainly instances in which extensive delay by the government justifies a denial of a motion for leave to amend a pleading, even, to proposed fraud counterclaims or affirmative defenses. For example, in Shell Oil Co. v. United States, a judge of the United States Court of Federal Claims denied the government's motion for leave to amend to add an affirmative defense and various fraud counterclaims as "late and baseless." See Shell Oil Co. v. United States, 123 Fed. Cl. at 727.  In particular, in Shell Oil Co. v. United States, the United States Court of Appeals for the Federal Circuit held that the government

> was liable for breach of a production contract entered into during World War II and remanded the case for a determination of damages. During post-remand discovery [to the United States Court of Federal Claims] allowing the Government to finalize preparation for a February 2016 evidentiary hearing on damages, a dispute arose about the discovery of Plaintiffs' insurance policies and settlements reached in environmental liability coverage litigation in other judicial forums many years ago.

Id. at 710. In light of this discovery by defendant of the Shell Oil plaintiffs' insurance policies, defendant sought leave from the court, following the remand from the Federal Circuit, to amend its answer to assert an affirmative defense and counterclaims based on the Special Plea in Fraud statute and the anti-fraud provisions of the Contract Settlement Act of 1944 more than seven years after it filed its original answer in the case. See id. at 717, 721. Defendant in Shell Oil stated that its proposed amended answer with new counterclaims "would not result in an undue burden on or prejudice the Oil Companies [plaintiffs]," and that its counterclaim was "'merely one additional claim alleging that plaintiffs wrongly sought double-payment from Federal and state entities of amounts that they had already recovered from their insurers.'" Id. at 722 (quoting defendant's motion for leave to amend). The Shell Oil court, however, stated that:

> The relevant facts here are that the Government was on notice in 1992, that the Oil Companies were involved in insurance coverage litigation. Pls. Resp. App. Ex. A (the Government's 3/19/1992 interrogatories). In 1997, during a Joint Status Conference before the California District Court, the Government also stated, "The United States has long known that . . . the Oil Company Defendants actively litigated claims against their insurance carriers, in which they alleged that any liability for . . . the McColl Site was an 'occurrence' within the meaning of their insurance policies[.]" Pls. Reply App. Ex. B. Therefore, at the *very* least, the Government knew that the Oil Companies had made insurance coverage claims that likely included the McColl site, *well before* the allegedly fraudulent conduct—the Oil Companies' submission of their claim to the GSA in November 2005. Thus,

The court also considers whether plaintiff's allegations that defendant's motion for leave to amend was filed for an improper purpose. Plaintiff states:

> The government's proposed amendment is intended to delay the trial. The government fully understands, and intends, that if the amendment is allowed, it will necessarily extend discovery, and place an enormous financial burden on LW which has already been found to finance considerable portions of the performance of the Project for the government without compensation. It is readily apparent that the government seeks delay in order to gain a financial negotiating advantage over LW in a case that the government cannot win on the merits.

---

> the Government's argument that it could not have raised its proposed fraud counterclaims in its Answer before 2015 is simply not credible. Likewise, the Government's excuse that "we were snookered" and "the victims of fraud" is not supported by the record. 10/20/15 TR 13–14.

> The CERCLA litigation between the United States and the Oil Companies began more than twenty years ago and it has been ten years since this case was transferred to the United States Court of Federal Claims. To permit the Government to assert fraud counterclaims "substantially changes the theory on which the case has been proceeding[.]" Cencast Services, L.P. v. United States, 729 F.3d 1352, 1364 (Fed. Cir. 2013) (quoting 6 Wright & Miller § 1487 (3d ed. 2013)).

> Finally, it did not escape the court's attention that the Government improperly advised the court that "[t]here is no statute of limitations for the special plea on fraud." 10/20/15 TR 14. But, the predecessor to the United States Court of Appeals for the Federal Circuit has held "the only statute of limitations applicable is the general six-year statute of limitations" in a Government special plea in fraud claim case. See SGW, Inc., 20 Cl. Ct. at 181. Here the "fraud" alleged by the Government is the claim the Oil Companies submitted to GSA in 2005. Therefore, the statute of limitations has run. In addition, the six-year statute of limitations in 28 U.S.C. § 2501 applies to FFCA claims alleged under 28 U.S.C. § 2514 now bars the Government from litigating a FFCA claim in this case.

> For these reasons, the court has determined the Government's Motion For Leave To Amend Its February 25, 2008 Answer is late and baseless.

Id. at 726–27 (emphasis in original). The United States Court of Appeals for the Federal Circuit recently affirmed the United States Court of Federal Claims' denial of the government's motion for leave to amend. See Shell Oil Co. v. United States, 2018 WL 3446960, at *11.

The government responds that LW's assertion that the government's motion for leave to amend was filed for "an improper purpose, or in bad faith, is without basis." The government states that:

> The Government's purpose for filing the motion for leave is to ensure that a contractor—that is now 98 percent owned by Sidney Brantley, that appears to have been improperly formed . . . that misrepresented its status as an SDVOSB . . . and that failed to even complete a contract it fraudulently obtained—cannot further profit from that fraudulent behavior.

The government also asserts that LW's allegation that its motion "is to delay trial is absurd, given that there is no currently scheduled trial date." The government further states that it "filed its motion in the hope that LW would receive no more ill-gotten gains from its abuse of the SDVOSB set-aside program."

Amendment of defendant's answer at this point will cause some delay and additional discovery, including another deposition of at least some of the witnesses previously deposed, depending on the parties' willingness to expedite remaining discovery. LW, however, has not provided any factual support regarding plaintiff's suggestion of bad faith, nor is there any indication in the record currently before the court that the government is seeking leave to amend for an improper purpose. It appears that the intention to file the amended answer is motivated by an intent on the part of the government to meet its responsibilities to uncover and not allow fraud with respect to a government contract. The defendant also has a responsibility not to condone paying for and rewarding a contractor which may have committed fraud and to recover funds improperly paid to any such contractor. As stated above, allegations of fraud must be taken seriously by the government as protectors of taxpayer funds. There is insufficient evidence in the record before the court at this time to find that the government's motion for leave to amend its answer was filed for an improper purpose, to the contrary. See Hanover Ins. Co. v. United States, 134 Fed. Cl. at 61 (holding that defendant did not file motion for leave for an improper purpose when plaintiff did "not provide any factual support for its argument regarding defendant's motive," and, thus, plaintiff's "argument concerning defendant's motive is conclusory and therefore meritless"). Although the United States Attorney's Office for the District of South Carolina, Columbia division, reviewed the Mixsons' qui tam complaint, declined to participate in the qui tam action, agreed to the dismissal of the Mixsons' qui tam suit, and the DOJ did not initiate a fraud action against LW and its principles, such activities are not determinative of whether fraud actually occurred. Allowing defendant to amend its answer and allowing the fraud allegations to be reviewed by the court in the instant case, the court is not deciding whether fraud occurred, but, rather, is allowing both parties to present their arguments.

## CONCLUSION

Although the court recognizes the passage of time which has occurred between when defendant filed its original answer and when defendant filed its motion for leave to file a second amended answer to include fraud counterclaims, an unjust enrichment counterclaim, and an affirmative defense of common law fraud, and that additional

discovery will be required to explore defendant's assertions regarding plaintiff's alleged fraudulent misrepresentation of its SDVOSB status when it submitted its proposal for the Fort Jackson contract, allegations of fraud and unjust enrichment in government contracting should not be dismissed lightly or without scrutiny when brought to a court's attention. Better and earlier coordination between the VA client and the DOJ and greater in depth review of SDVOSB status by the VA of a bidding contractor before contract award would have been far preferable in this case. The court, however, will allow defendant's motion for leave to amend its answer with respect to those of defendant's FCA counterclaims which have not been disallowed by the court above, as well as defendant's common law fraud counterclaim, defendant's unjust enrichment counterclaim, and defendant's affirmative defense of common law fraud. This conclusion, however, is not a final determination as to the validity of the counterclaims and affirmative defense now permitted to be asserted by defendant. Defendant still has the burdens to prove the counterclaims and plaintiff will have an opportunity to refute the fraud allegations regarding LW's SDVOSB status. The court also determines that if additional depositions are necessary, and fact discovery needs to be re-opened in the current case, because of the passage of time and the previously held depositions, any necessary and relevant, supplemental depositions of previously deposed witnesses in Case No. 14-960C should be conducted at defendant's expense. Within five weeks of the date of the issuance of this opinion, in a joint status report, the parties, after conferring, shall propose a joint schedule suggesting specific dates for future proceedings, including any further discovery, necessary and relevant to resolve this case. If the parties cannot agree, the joint status report shall include individual dates proposed by each party.

Accordingly, the court **GRANTS IN PART** the government's motion for leave to amend as to the government's FCA counterclaims relating to plaintiff's seven claims for payment submitted to the VA on the Fort Jackson contract on or after October 13, 2011, defendant's common law fraud counterclaim, unjust enrichment counterclaim, and defendant's affirmative defense of common law fraud. The court **DENIES IN PART** defendant's motion for leave to amend as to defendant's proposed FCA counterclaims relating to plaintiff's eighteen claims for payment submitted to the VA on the Fort Jackson contract before October 13, 2011. The defendant shall file its second amended answer, affirmative defense of common law fraud, and counterclaims consistent with this opinion within two weeks of the issuance of this opinion.

**IT IS SO ORDERED.**

s/Marian Blank Horn
**MARIAN BLANK HORN**
**Judge**